**The STATE of Texas for the Best Interest and Protection of R.L.I.**

No. 12–03–00276–CV.

Court of Appeals of Texas, Tyler.

Feb. 27, 2004.

Allen W. Ross, Fletcher & Ross, Jacksonville, for appellant.

Colin D. McFall, County Atty., for appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and DeVASTO, J.

## MEMORANDUM OPINION

SAM GRIFFITH, Justice.

Appellant R.L.I. appeals from an order of commitment for temporary inpatient mental health services. After a hearing without a jury, the trial court ordered R.L.I. committed to Rusk State Hospital for a period not to exceed ninety days. In five issues, R.L.I. asserts the evidence is legally and factually insufficient to support the order and her constitutional rights to due process and equal protection have been violated. We reverse and render.

### BACKGROUND

On August 4, 2003, an application for court-ordered temporary mental health services was filed requesting the court commit R.L.I. to Rusk State Hospital for a period not to exceed ninety days. The application was supported by a certificate of medical examination for mental illness, prepared by a physician, Dr. Cuellar, who had examined R.L.I. on August 3. Dr. Cuellar diagnosed R.L.I. as suffering from schizoaffective disorder, depressed type. The doctor indicated that R.L.I. is mentally ill and is likely to cause serious harm to herself. He based this opinion on R.L.I.'s statement that she "will surely die if not admitted." On August 3, R.L.I. was out of touch with reality, hallucinating, and expected to die. The doctor noted she had attempted suicide in the past. Dr. Cuellar also indicated that R.L.I. presents a substantial risk of serious harm to herself or others if not immediately restrained, which is demonstrated by her behavior and by evidence of severe emotional distress and deterioration in her mental condition to the extent that she cannot remain at liberty. He restated the above reasons as the basis for this conclusion.

On August 4, 2003, R.L.I. was examined by Dr. Charles Plyler who then also prepared a certificate of medical examination for mental illness. Dr. Plyler diagnosed R.L.I. as suffering from schizoaffective disorder, depressed. He found that R.L.I. is mentally ill and is suffering severe and abnormal mental, emotional, or physical distress, is experiencing substantial mental or physical deterioration of her ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment. On or about August 4, 2003, R.L.I. said, "I have hot flashes that are going to kill me." Dr. Plyler explained that R.L.I. is responding to somatic delusions of impending death. The doctor also found that R.L.I. presents a substantial risk of serious harm to herself or others if not immediately restrained, which is demonstrated by her behavior and by evidence of severe emotional distress and deterioration in her mental condition to the extent that she cannot remain at liberty. The bases of this opinion are R.L.I.'s statement that she has hot flashes that will kill her and her somatic delusions of impending death.

Dr. Plyler testified at the hearing. He examined R.L.I. on August 4. He stated that R.L.I. suffers from schizoaffective disorder, depressed type. Dr. Plyler stated

that R.L.I. is suffering severe and abnormal mental, emotional or physical distress, is experiencing substantial mental or physical deterioration of her ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment.

Dr. Plyler explained that R.L.I. is suffering from severe delusional distortions of her reality based largely on somatic concepts of illness, a misunderstanding of the significance of her hot flashes, and she frequently lives in fear of death when it is not a biological reality. These delusions interfere with her capacity to see to her own health and to function realistically in the daily activities of living, such as shopping and preparing meals. When asked if she has exhibited a continuing pattern of behavior while at the hospital that would tend to confirm her distress, Dr. Plyler explained that R.L.I. has complained bitterly of the hot flashes and expressed fear that she would pass in the night and no one would know she was dead.

The doctor further explained that she is chronically seeking relief from these presumed fatal illnesses which interferes with her nutrition. She does not eat well or sleep well and her condition destroys any quality of life that she might have. Her condition also interferes with her ability to provide for her basic needs because she does not feel well enough to go about the normal acts of preparing food and cooking nutritious meals. The doctor explained that R.L.I. was not doing well at home and was in danger of deteriorating and moving on into a more severe mental problem, part of it nutritional. He clarified that R.L.I.'s fears of presumed illness impair her ability to get out and take care of the normal healthful activities like eating, procuring food, and cooking. He stated that there are no other significant problems that would keep her in the hospital. The doctor testified that treatment in a less restrictive environment had been tried with little success. The referral information reflects that R.L.I. has lived in a state of absolute terror and fear of death moment to moment and she is virtually paralyzed by these fears. She interprets the hot flashes as potentially fatal experiences and she feels they will destroy her internal organs and brain.

On cross-examination, Dr. Plyler stated that R.L.I. can take care of her personal hygiene without assistance and prompting. She can initiate conversation and respond to conversation, but not always reasonable conversation. She is not always able to respond to questions. The doctor agreed that there is no evidence of any overt act showing intent to harm herself or others. She would be able to order food at the hospital canteen and nothing indicates she would have problems tendering money and buying things. Dr. Plyler explained that R.L.I. becomes socially and physically paralyzed and cannot interact with other people. He does not know whether she can clean her house. He doubts she can cook, but thinks she might be able to order meals in a restaurant. He does not believe she is a danger to others. He testified that R.L.I.'s family wants to support her, but apparently they cannot. When asked if he felt R.L.I. could survive safely in freedom with her son's assistance, Dr. Plyler responded that she would remain a very unhappy, miserable person. The doctor explained that apparently outpatient treatment has been tried and did not work. He felt that she would need inpatient treatment for a couple of weeks. She is presently on medication, which she consented to take.

Justin Smith, R.L.I.'s son, testified that he was not present the week his mother was taken to Rusk State Hospital so he did not observe her actions at that time. She

had lived with him earlier in the summer. He observed her in that time period and saw behavior that could have led to her coming to the hospital. He saw signs of deep depression and she seemed very paranoid. One day she called him and told him someone who had been jogging by her vehicle had stopped and tapped his headphone. Believing this person was doing something "to get at her," she was frantic and feared for her well-being. He explained that she did not consistently have the strength to do things. She would start tasks and not be able to finish. In April or May, R.L.I. became angry with Mr. Smith's fiancé, became aggressive, and pushed her. In the first few weeks R.L.I. lived with Mr. Smith, she was so depressed she barely got out of bed. She handled her daily tasks in an inconsistent manner. When she lived on her own, she would not get out of bed, drive anywhere, or go to the store for the things she needed. Mr. Smith has been concerned that she does not take her medications when living on her own.

On cross-examination, Mr. Smith testified that his mother is capable of feeding herself. She is capable of dressing herself, but at times, merely remained in the same clothes for days. She is able to initiate conversation and, at times, respond to questions, although not always in a rational manner. He said he is willing to assist his mother, but in the past that did not work. His grandmother and his aunt are willing to help R.L.I. She has a source of income that would enable her to pay her bills for the next few months. In May, R.L.I. was arrested for contacting 911 twenty-six times in a ten to fifteen minute period.

R.L.I. took the witness stand in her own behalf. She said she wants to be released from the hospital so she can eat when she wants and sleep the hours she wants to sleep. She said she prepares her own meals and does her own shopping and house cleaning. She frequently eats at Luby's to get a wholesome meal. She dresses herself and takes care of her own personal hygiene. She has a small trust account as income to pay her bills. When asked about the jogger her son testified about, she explained there was a joke or rumor that her truck had eyes and ears and people thought if they ran around it the truck would do something. She explained that she got mad at her son's fiancé when she heard her use the word "psycho" because she thought the woman was referring to her. She has a psychiatrist whom she sees on a regular basis, as well as a medical doctor. She said she would like to move near her mother and sister, stating that would be "very healthy." If released, her family would help her and she would take her medications. If her house were on fire, she would get out of it. If she saw a properly addressed, stamped letter on the ground next to a mailbox, she would put it in the mailbox. If she saw someone being assaulted, she would call 911. If she had a physical ailment and could not take care of it herself, she would call her mother and sister and consult a doctor. Until recently, she handled her own finances.

On cross-examination, R.L.I. explained that she had called 911 one time while at her son's house because he was not at home and she did not want to be alone. She wanted someone to help her monitor her situation when she experienced hot flashes and nervousness. In April or May, she was arrested for calling 911 twenty-nine times which she had done because someone was trying to blackmail her for $14,000.00. R.L.I. explained that she had felt safer at the hospital or the jail where she could be watched. However, she now understands that a lot of those symptoms can be helped with psychiatry. One time,

several months ago or last year, she tried to commit suicide. In response to the State's inquiry about how many suicide attempts there were, she said, "I guess you could say let them know what they're doing is wrong or was wrong, would have been to probably ascertain. And when they come across in that respect, it would have been simply to let them know how serious...." She was cut off by her attorney. She explained that, although she did not wish to take her medication that morning, she did take it and, because of the medication, she is only able to describe the information the State requests slowly and gradually.

The trial court found that R.L.I. is mentally ill and is suffering severe and abnormal mental, emotional, or physical distress; experiencing substantial mental or physical deterioration of her ability to function independently; and unable to make a rational and informed decision as to whether or not to submit to treatment. The trial court entered an order reflecting these findings and ordering R.L.I. committed to Rusk State Hospital for inpatient care for a period not to exceed ninety days.

### SUFFICIENCY OF THE EVIDENCE

■ In her first issue, R.L.I. asserts the evidence is neither legally nor factually sufficient to support the order of commitment. She complains that the State did not present evidence of an overt act or a continuing pattern of behavior to support the commitment and evidence that R.L.I. may be mentally ill does not satisfy the statutory standard.

■ In a legal sufficiency review where the burden of proof is clear and convincing evidence, the reviewing court must consider all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or convic-

tion that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). The reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

The trial judge may order a proposed patient to receive court-ordered temporary inpatient mental health services if the judge or jury finds, from clear and convincing evidence, that the proposed patient is mentally ill and, as a result of the mental illness he is likely to cause serious harm to himself, is likely to cause serious harm to others, or is (i) suffering severe and abnormal mental, emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of his ability to function independently, which is exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety, and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment. TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Vernon 2003). To be clear and convincing under this statute, the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm either the likelihood of serious harm to the proposed patient or others, or the proposed patient's distress and the deterioration of his ability to function. TEX. HEALTH & SAFETY CODE ANN. § 574.034(d) (Vernon 2003).

The State provided expert testimony explaining that R.L.I. is mentally ill. According to the two doctors who examined R.L.I. in early August, she was delusional and the delusions distorted her view of reality. The delusions focused on presumed fatal illnesses, the fear of which

virtually paralyzed her, making it difficult for her to handle normal daily activities. Mr. Smith testified that his mother stayed with him approximately three to four months before she was taken to Rusk State Hospital. At that time, she was depressed and paranoid.

Neither doctor provided evidence of an overt act. Assuming R.L.I.'s attack on Mr. Smith's fiancé is an overt act, it is too remote in time to be the basis of this commitment. The evidence shows that R.L.I.'s fear of presumed illness interferes with her ability to provide for her basic needs. However, the State did not offer evidence showing that R.L.I. was unable to clothe, feed, or house herself, or was unable to provide for her own health or safety. Mr. Smith provided evidence that R.L.I. was depressed and paranoid in April and May. The doctors provided evidence that R.L.I. was delusional in early August. Together, this does not constitute evidence of a continuing pattern of behavior from April through August. Further, evidence of continuing delusional behavior merely reflects that an individual is mentally ill and in need of hospitalization but does not provide the continuing pattern of behavior necessary to support a commitment. *In re C.O.*, 65 S.W.3d 175, 182 (Tex.App.-Tyler 2001, no pet.); *Broussard v. State*, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no pet.).

The State did not meet its burden under the statute because there was no evidence of an overt act or continuing pattern of behavior tending to confirm a substantial deterioration of R.L.I.'s ability to function independently to provide for her basic needs. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). Considering all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable trier of fact could not have formed a firm belief or conviction that this finding

was true. *See In re J.F.C.*, 96 S.W.3d at 266. The evidence is not legally sufficient to support the trial court's order. *See id.* We sustain R.L.I.'s first issue to the extent it complains there is no evidence to support the order of commitment.

### CONCLUSION

The evidence is legally insufficient to support the trial court's order of commitment for temporary inpatient mental health services. We need not address the remainder of R.L.I.'s complaints. *See* TEX. R.APP. P. 47.1.

We *reverse* the trial court's order and *render* judgment denying the State's application for temporary court-ordered mental health services.