**The STATE of Texas for the Best Interest and Protection of C.C., III.**

Nos. 05–07–01688–CV, 05–07–01689–CV.

Court of Appeals of Texas, Dallas.

May 15, 2008.

Douglas Alan Barnes, Dallas, TX, appellant.

Melanie Barton, Assistant District Attorney, Dallas, TX, for Appellee.

Before Justices FITZGERALD, RICHTER, and LANG–MIERS.

## OPINION

Opinion by Justice FITZGERALD.

C.C., III appeals from an order of commitment for temporary mental health services as an in-patient (no. 05–07–01688–CV) and an order to administer psychoactive medication (no. 05–07–01689–CV). In the involuntary commitment case, appellant brings two issues contending the evidence is legally and factually insufficient to support the jury's findings. In the medication case, appellant contends the evidence is legally and factually insufficient, that the doctor applying for the order lacked standing, and that the order authorizing the administration of psychoactive medication is not valid if we reverse the commitment order. We conclude the State failed to prove by clear and convincing evidence the necessary element for commitment in this case that appellant is experiencing substantial mental or physical deterioration of his ability to function independently. We reverse the trial court's judgment and render judgment denying the State's application for court-ordered temporary mental health services. Because a court order to receive inpatient mental health services is a requirement for an order authorizing the administration of psychoactive medication, we reverse the order granting the application and render judgment denying the application to administer psychoactive medication.

## BACKGROUND

Appellant is a twenty-six-year-old male who in November 2007 was attending the SMU MBA program. Appellant lived alone in an apartment. Appellant was involuntarily committed to Timberlawn Mental Health System on Monday, November 12, 2007.

Appellant's psychiatrist, Dr. Mark Unterberg, testified that appellant suffered from bi-polar disorder. When appellant did not take his medicine, he suffered from delusions and auditory hallucinations. The hallucinations directed him to do things, and he sometimes attempted to do them. Dr. Unterberg testified to incidents of appellant's delusions and auditory hallucinations and appellant's responses to them. About a year before his commitment, appellant "had been commanded" to go to the airport and travel to New York to meet a young woman. Appellant went to the airport and while at the airport, he "heard another message" telling him that the young woman was at her house, and appellant drove to her house. The young woman's mother told appellant she was still in New York, and the mother would not admit appellant to the house. About three days before appellant's commitment, hallucinations and delusions directed appellant to go to a particular restaurant to

meet with Laura Bush and to receive a large sum of money; appellant was then to go to another location to meet Bush's daughters "and be involved with them in an intimate way." Appellant went to the restaurant, and Mrs. Bush was not there; appellant did not go to the second location to meet the Bush daughters. Appellant also suffered from a delusion that he was constantly on television and that he was owed large sums of money for product advertisements. About a week and a half before his commitment, appellant had a delusion that Dr. Unterberg "had set up a command" for appellant to go to Israel and for appellant to be killed or crucified when he got there. Appellant then had another delusion that, as President of the United States, he had ordered the military to kill Dr. Unterberg and the doctor's family; appellant was confused when the order was not carried out. Dr. Unterberg testified that when appellant's delusions do not come true, appellant does not question their truth; instead, he alters his perception of reality to fit and maintain the delusion. Appellant believes he is telepathic and that the messages he hears are real.

The events leading to appellant's commitment began a few days earlier. Appellant stopped communicating with his family. On Saturday, appellant was supposed to meet his father for lunch at a restaurant, but appellant did not show up at the restaurant or notify his father. When his father telephoned him, appellant did not answer the telephone. Appellant also stopped answering telephone calls from Dr. Unterberg, who believed he had a good therapeutic relationship with appellant.[1] During this period, some of appellant's friends contacted appellant's family and expressed concern for appellant. SMU also contacted appellant's family with concerns that appellant "was not acting right."

On the evening of November 12, appellant was still not answering telephone calls from his father or from Dr. Unterberg, and Dr. Unterberg and appellant's father went to appellant's apartment. They knocked on the door and asked appellant to let them in, but appellant did not respond. They saw lights and the television on in the apartment, and Dr. Unterberg could see appellant moving around in the apartment. When appellant would not respond to their enquiries and they could not get hold of the apartment manager, they called the police. Dr. Unterberg explained the situation to the police officers. The officers knocked on the door and told appellant that if he did not let them in, they were going to enter by force; appellant then opened the door. Appellant's father testified that the police questioned appellant about his condition and what he had done that day. According to appellant's father, appellant told the officers he had gone to SMU that day to meet with a professor who was going to be teaching nude and "would also be performing the sex act" with him. The officers asked appellant why he would get to do that, and appellant said he was special because he was the President. The officer said he thought Mr. Bush was the President, and appellant said, "my people have taken care of that and now I'm the President." When appellant talked to the officers about the President "performing the sexual act with them," the officers took appellant into custody. At Dr. Unterberg's request, the officers took appellant to Timberlawn Mental Health System.

Appellant's father testified that when appellant is on his medication, he is a rational, intelligent, and mature young

1. The doctor was unaware before appellant's commitment that appellant believed Dr. Un-terberg had plotted to send appellant to Israel to kill him.

man and would not say things like he said to the officers. Appellant is now angry with his father and believes his father is the reason he is in the hospital and unable to attend college. Appellant does not believe there is any reason for him to be hospitalized. Appellant's father is concerned appellant will shut off communication and leave. On a previous occasion, appellant got in his car and drove down I–30 until he ran out of gas. Appellant abandoned the car on the side of the interstate and telephoned his grandmother and told her the car had burned up. The police found appellant lying in the grass beside the interstate reading a book. On another occasion, when appellant's father tried to take him to the doctor, appellant got out of the car in east Dallas where he did not know anyone or know the area. Appellant's father testified he is afraid appellant will end up homeless and, because of his delusions, not know how to contact his family.

Appellant testified that on the evening of November 12, he was sitting in his apartment drinking Powerade and watching football on television. Appellant answered calls from "people that I liked, people that I trusted, ... people that I didn't feel were trying to stalk me, kept calling me over and over again, and being really, really strange." That day, appellant had exercised, had done his laundry, gone to McDonald's, gone to "Office Hours to get some help on finance," returned home and cleaned his apartment, and read BBC.com news articles before watching the football game on television. He testified that before being taken to Timberlawn, he lived alone, did his laundry, got his meals, and took care of the daily activities of living. Appellant denied telling the police officers that his teacher would be teaching in the nude and having sex with him; appellant testified his father made those things up. Appellant also denied telling Dr. Unterberg about going to a restaurant to meet Laura Bush or that he thought Dr. Unterberg would have appellant sent to Israel to be killed or that he had ordered the military to kill the doctor and his family. Appellant denied having any suicide intent and stated that he wanted to live "just to see how it ... all plays out[;] ... who is the person that ends up killing me, or how do I die[;] do I die by natural causes or does someone just decide to kill me." Appellant also testified that while in the hospital, he had refused to take his medication and that he felt great, had been eating right and exercising, had been sleeping well, and felt less depressed.

The jury found appellant was mentally ill but that he was not likely to cause serious harm to himself. However, the jury found that as a result of his mental illness, appellant would, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress and would continue to experience deterioration of his ability to function independently and was unable to make a rational and informed decision as to whether or not to submit to treatment. The trial court did not submit a question on whether appellant was likely to cause serious harm to others. The court ordered appellant committed as an in-patient for a period not to exceed 90 days.[2]

After dismissing the jury in the commitment case, the trial court held a hearing on the application to administer psychoactive

---

2. Although the 90–day commitment period has run, this appeal is not moot. We recognize that an inappropriate commitment has effects which are "manifestly severe and prejudicially unfair," and this appeal is an opportunity for some mitigation of those effects. See State v. Lodge, 608 S.W.2d 910, 912 (Tex. 1980); D.J. v. State, 59 S.W.3d 352, 354 (Tex. App.-Dallas 2001, no pet.).

medication to appellant. The court took judicial notice of the testimony in the involuntary commitment trial. The court then heard the testimony of Dr. Unterberg about the benefits, risks, and side effects of the proposed medications. Appellant then testified about the side effects of the medication upon him and that he did not wish to take the medication. At the conclusion of the hearing, the trial court granted the application to administer psychoactive medication.

## COURT–ORDERED TEMPORARY HEALTH SERVICES

■ Section 574.034 of the Texas Health & Safety Code sets out the requirements for court-ordered temporary inpatient mental health services. That section states,

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

\* \* \*

■ (d) To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a), (d) (Vernon 2003). If the court or jury fails to find by clear and convincing evidence that the proposed patient is mentally ill and meets the criteria for court-ordered mental health services, the court shall enter an order denying the application for court-ordered temporary mental health services and order the immediate release of a proposed patient who is not at liberty.[3] *Id.* at 574.033.

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979) (per curiam); *D.M. v. State,* 181 S.W.3d 903, 904 (Tex.App.-Dallas 2006, no pet.). In reviewing the legal sufficiency of the evidence when the burden of proof is clear and convincing evidence, we examine all the evidence in the light most favorable to the jury's finding to determine whether

---

3. The record in this case does not show whether appellant is still involuntarily committed. Appellant's brief does not request that we order his immediate release.

a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all contrary evidence unless a reasonable factfinder could not. *Id.; see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

An expert diagnosis of mental illness, standing alone, is not sufficient to confine a patient for treatment. *M.S. v. State*, 137 S.W.3d 131, 136 (Tex.App.-Houston [1st Dist.] 2004, no pet.). Likewise, evidence that merely reflects a patient's mental illness and need for hospitalization is not sufficient to meet the State's burden. *Id.* The expert's opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex.App.-Texarkana 2007, no pet.); *T.G. v. State*, 7 S.W.3d 248, 252 (Tex.App.-Dallas 1999, no pet.).

The jury found appellant was not a danger to himself, and the trial court did not submit the issue of whether appellant was a danger to others. Appellant concedes he is mentally ill. Therefore, to meet the requirements of section 574.034 for involuntary commitment, the State had to prove by clear and convincing evidence that appellant was

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C). Appellant asserts the evidence is legally insufficient to prove clearly and convincingly that as a result of his mental illness, appellant experienced deterioration of his ability to function independently.

In this case, the only evidence before the jury that appellant suffered deterioration of his ability to function independently was Dr. Unterberg's answer "Yes" to the question, "Is he deteriorating in his ability to function independently?" Dr. Unterberg gave no examples showing appellant's ability to function independently had, in fact, deteriorated. For the evidence of deterioration of ability to function independently to be clear and convincing, there must be evidence of a recent overt act or a continuing pattern of behavior that tends to confirm the deterioration of the proposed patient's ability to function. *Id.* 574.034(d)(2). In this case, there is no evidence of a recent overt act or continuing pattern of behavior tending to confirm the deterioration of appellant's ability to function independently.

The only evidence of appellant's actions and behavior concerning his ability to function independently shows that he can function independently, and the evidence does not show appellant has suffered any deterioration of his ability to function independently. Appellant testified that on the day he was committed, he had exercised, done his laundry, gone to "Office Hours" to get help with finance, gone to a restaurant, cleaned his apartment, read internet news articles, and was watching football on television when his father and psychiatrist arrived at his door. In the days before his commitment, appellant lived alone, did his laundry, got his meals, and took care of

the daily activities of living. Since his commitment, appellant has been eating right, exercising, and sleeping well.

That appellant refused to answer his father's and Dr. Unterberg's telephone calls does not tend to show deterioration of ability to function independently. Nor does the evidence of appellant's delusions and hallucinations show deterioration of his ability to function independently. That appellant drove to an airport and a restaurant under the delusions that he was to meet people and collect a large sum of money does not indicate a deterioration of ability to function independently. That appellant ran out of gas on the interstate and telephoned his grandmother and was found by the police off the side of the road is not evidence of deterioration of ability to function independently. Nor do appellant's delusions that appellant thought he was the President, that Dr. Unterberg tried to have him killed, or that he had ordered the military to kill Dr. Unterberg constitute evidence of deterioration of appellant's ability to function independently. The evidence that appellant's friends expressed concern to appellant's parents about appellant's condition and the evidence that SMU thought appellant was not acting right are too vague to constitute clear and convincing evidence of a recent overt act or pattern of behavior. The evidence that appellant had stopped taking his medication before his commitment and refused to take his medicine in the hospital is not evidence of deterioration of ability to function independently. *See In re F.M.*, 183 S.W.3d 489, 494–98 (Tex. App.-Houston [14th Dist.] 2005, no pet.).

The evidence of appellant's delusions and auditory hallucinations show appellant is mentally ill, and we do not question Dr. Unterberg's conclusion that appellant would benefit from hospitalization. However, an expert medical diagnosis alone is not sufficient to support involuntary commitment. *State ex rel. E.E.*, 224 S.W.3d at 794; *T.G.*, 7 S.W.3d at 252. The expert's opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *State ex rel. E.E.*, 224 S.W.3d at 794; *T.G.*, 7 S.W.3d at 252. Although Dr. Unterberg concluded that appellant suffered deterioration of his ability to function independently, the testimony in the record did not provide clear and convincing evidence of this conclusion. The evidence of appellant's delusions and hallucinations is insufficient to justify involuntary commitment on the grounds of mental distress and the deterioration of the ability to function independently. *See In re F.M.*, 183 S.W.3d at 499–500 (patient's delusions she worked for President Bush and talked to ghosts held legally insufficient to support commitment); *State ex rel. R.L.I.*, 132 S.W.3d 539, 543–44 (Tex.App.-Tyler 2004, no pet.) (patient's delusion her hot flashes would kill her and somatic delusions of impending death held legally insufficient to support commitment); *K.T. v. State*, 68 S.W.3d 887, 893 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (patient's delusions she was pregnant and had vaginal sutures held legally insufficient to support commitment); *D.J. v. State*, 59 S.W.3d 352, 357 (Tex. App.-Dallas 2001, no pet.) (patient's delusions she had undergone dehumanizing surgery by satellite and used as a guinea pig by unknown technological forces held legally insufficient to support commitment); *Broussard v. State*, 827 S.W.2d 619, 620–21 (Tex.App.-Corpus Christi 1992, no writ) (patient's delusions she was an FBI agent and an attorney, that the trial judge and one of her doctors were mass murderers she had previously convicted and put in jail, that other MHMR workers were felons she had sent to jail, that one of her doctors was a woman dressed as a man, and that her medicine was poisonous

held legally insufficient to support commitment). *Cf. In re C.C.S.*, 113 S.W.3d 459, 461–62 (Tex.App.-Amarillo 2003, no pet.) (patient's delusions she was female counterpart of Jesus Christ and she and her children would soon be traveling to kingdom of God, together with her selling all the family's possessions including her children's coats, removing her children from school, and failing to provide necessary medical care to children held sufficient evidence to support commitment); *State ex rel. L.C.F.*, 96 S.W.3d 651, 657–58 (Tex. App.-El Paso 2003, no pet.) (patient's entering neighbor's house without permission under belief that rap singer Eminem was after him and was going to kill him, and after leaving neighbor's house running down the street and hiding under a parked car, together with presence of rotting food in kitchen held sufficient evidence to support commitment); *Goldwait v. State*, 961 S.W.2d 432 (Tex.App.-Houston [1st Dist.] 1997, no writ) (patient's belief he and his brothers had genetically superior blood, his desire to bleed himself and his brothers to provide their blood for hospitals, his belief the CIA was after him, his statement that he had been recently gassed, his selling all his possessions, and his jumping out of a bus because he believed the driver was intentionally going to kill everyone held sufficient evidence to support commitment).

We conclude the State has failed to present legally sufficient clear and convincing evidence of deterioration of appellant's ability to function independently, which is a necessary element for commitment under section 574.034(a)(2)(C). We sustain appellant's issues.

## ORDER TO ADMINISTER PSYCHOACTIVE MEDICATION

■ Section 574.106 of the Texas Health and Safety Code governs hearings and orders to authorize the administration of psychoactive medication. One of the requirements for an order to administer psychoactive medication is that the patient be "under a court order to receive inpatient mental health services." Tex. Health & Safety Code Ann. § 574.106(a)(1) (Vernon Supp.2007). Because we have determined the evidence is legally insufficient to support the court order to receive inpatient mental health services, the order authorizing administration of psychoactive medication is also invalid. *Id.; see In re F.M.*, 183 S.W.3d at 500.

## CONCLUSION

In cause number 05–07–01688–CV, we reverse the trial court's order granting the application for court-ordered temporary mental health services, and we render judgment denying that application. In cause number 05–07–01689–CV, we reverse the trial court's order granting the application to administer psychoactive medications, and we render judgment denying that application.