Opinion issued December 31, 2008

 
 





    





In The
Court of Appeals
For The
First District of Texas
____________

NOS. 01-08-00371-CV & 01-08-00372-CV
____________

K.E.W. 

V.
 
THE STATE OF TEXAS




On Appeal from the Probate Court 
Galveston County, Texas
Trial Court Cause Nos. 3318 and 3318A



 
O P I N I O N

          In these two accelerated appeals, appellant, K.E.W., challenges the legal and
factual sufficiency


 of an order of involuntary commitment for temporary inpatient
mental health services


 and a related order for the administration of psychoactive
medications.


 We determine whether the evidence was legally sufficient to support
the challenged orders.


 We reverse and render judgment in favor of K.E.W. 
Background
          On April 17, 2008, K.E.W., a patient of Gulf Coast Center Mental Health and
Mental Retardation (“MHMR”) who had previously been diagnosed as schizophrenic,
went in for an appointment that he had made. Although a regular patient, he had not
been seen by the staff since the prior October. While at the Gulf Coast Center,
K.E.W. informed the staff that he had a plan to impregnate multiple women and asked
repeatedly for a particular female staff member whom he stated that he wanted to
impregnate.


 The staff became concerned with his extremely paranoid behavior and
his attempts to interfere with female staff even though he was directed otherwise. 
The staff ultimately placed the female staff member behind a closed door until
K.E.W. could be escorted away by the police. K.E.W. would not stand still or listen
to others and was walking in and around the building, pacing and smoking, refusing
to stop or calm down. Dr. Pugh, the physician who saw him for the appointment,
believed that K.E.W. did not have an appropriate insight into his situation and might
be a danger to others and called the police.


 When the police arrived, K.E.W. was
uncooperative, and he was placed in the back of the police car and escorted to the
hospital at the University of Texas Medical Branch at Galveston.
          At the hospital, K.E.W. explained to doctors that aliens put a computer chip in
his abdomen and right ring finger and that he was chosen to help populate a new and
better race of humans. His goal was to search and find as many women as he could
to procreate quickly, and he had a firm belief that there was a flock or group of
women whom he needed to find and impregnate, one of whom was his adult step-daughter. He believed that some of the women for whom he was searching had been
at or near the hospital when he was brought into the emergency room and that the
hospital staff had known that and discussed it but had withheld information from him
about it, and he was very angry at the staff for not giving him the information he
needed. He became very agitated and insisted that he needed to leave in order to
complete his mission and asked the treatment team to help him contact the women. 
He was diagnosed as having schizoaffective disorder, specifically being paranoid
schizo-chronic.
          The State filed an application for court-ordered temporary mental health
services and an application for an order to administer psychoactive medication. At
the hearing on the State’s application for temporary commitment, in addition to 
limited testimony from two members of the Gulf Coast Center’s staff about the events
which led to K.E.W.’s hospitalization, and appellant’s medical records,


 there was
testimony from Dr. Michael Stone and Dr. Waleska Ortiz. Both were physicians who
met with K.E.W. at the hospital after he was taken there from the Gulf Coast Center
MHMR. 
          Stone


 stated that he did a psychiatric evaluation of K.E.W. and determined that
K.E.W. was suffering from mental illness and had been diagnosed as schizophrenic. 
Stone testified that K.E.W. demonstrated that he was a danger to others, citing
K.E.W.’s statements to him on several occasions that there was a flock or group of
women, including his step-daughter, whom K.E.W. needed to find and impregnate.


 
Stone also believed that K.E.W. could be a danger to others because, during the
meeting with Pugh, K.E.W. “was very threatening to the point [that] Dr. Pugh felt
[K.E.W.] needed to be admitted [to the hospital] immediately.”


 Stone admitted that
K.E.W. did not manifest any threatening behavior to him while K.E.W. was in the
hospital, but stated that he was very concerned because K.E.W. had a very firm belief
in his delusions, and Stone thought that if K.E.W. found a female whom he believed
was promised to him, he would try to impregnate her. Stone agreed that K.E.W. had
difficulty processing information and considered K.E.W. to have abnormal physical,
mental, and psychiatric deterioration because of the bizarre nature and frequency of
his delusions. He also did not believe K.E.W. was capable of functioning
independently in the community because K.E.W. did not believe he had a mental
illness, was set on finding his flock of women and impregnating them, and was
preoccupied with his delusions. Stone recommended antipsychotic medication and
treatment at Austin State Hospital.
          Stone admitted that he had not verified the existence of any of the women
whom K.E.W. claimed that he wished to impregnate and, as far as he knew, K.E.W.
had taken no concrete steps to find them, though K.E.W. had a plan to carry out the
creation of a new society and carried papers about the plan with him. He admitted
also that K.E.W. said that he was not planning on impregnating the women against
their will, but was concerned whether K.E.W. would understand what a woman would 
consider to be against her will. He agreed that the only group that K.E.W. was a
danger to was these women, and women in general in society, because K.E.W., in his
confused belief, might believe mistakenly that a woman was one who was promised
to him and wanted to be impregnated. 
          Dr. Ortiz testified that, while in the hospital, K.E.W. became agitated regarding
the women he was seeking. She detailed an incident where K.E.W. believed that some
of the women he was seeking had been in the emergency room and that he had just
missed them. K.E.W. believed that the hospital staff, including Ortiz, knew this and
had information where the women were, but were withholding it from him. He
thought that he heard Ortiz and the nurses laughing about how he had just missed the
women, thought it was a conspiracy against him, and was very upset. He was
convinced that Ortiz was able to access special agents who would have the key that
would take him to the portal where the women were located. He also told Ortiz that
he had the ability to hear thoughts through special frequencies and told her that he
may have heard or perceived that she was probably lying to him. 
          Ortiz was concerned about two behaviors of K.E.W. as a potential danger. The
first was the potential for non-consensual sexual interaction with the specific women
he sought, if he were to find them. She explained that K.E.W. was very intrusive, had
invaded her space on several occasions, and she did not know if he would understand
that “no” meant “no,” given his state of mind at the time. However, she admitted that
K.E.W. did not state that he intended to impregnate anyone against her will and did
not make sexual advances toward anyone on the staff. The second concern was
related to K.E.W’s misperception that he received information from brain waves or
special abilities. Ortiz feared that K.E.W. could get very angry and agitated if he
perceived or misperceived certain information. Ortiz felt that the unit was organized
and safe but, if K.E.W. was in another situation, with another stimulus, “perhaps
something would happen.” 
          K.E.W. put on no testimony or evidence.
          The trial court found that K.E.W. was suffering from mental illness and, as a
result of that mental illness, was likely to cause serious harm to others. The court also
found that K.E.W. was suffering from severe and abnormal mental, emotional, and
physical distress, and ordered him committed to the Austin State Hospital for
inpatient care not to exceed 90 days. In its written order, the trial court stated that
it found, by clear and convincing evidence, that K.E.W. was mentally ill, and that, as
a result of that mental illness, K.E.W. was “likely to cause harm to others,” was
“suffering severe and abnormal mental, emotional, or physical distress,” was
“experiencing substantial mental or physical deterioration of his ability to function
independently, which [was] exhibited by [K.E.W.’s] inability, except for reasons of
indigence, to provide for his basic needs, including food, clothing, health, or safety,”
and was “unable to make a rational and informed decision as to whether or not to
submit to treatment.”
          The court then held a hearing on the administration of psychoactive
medication. The State called Dr. Stone, who testified that K.E.W. was taking some
medications ordered for him and refusing others, and that, in Stone’s opinion, K.E.W.
was not capable of understanding the need for medication because of his mental
illness. Stone explained that K.E.W. did not really believe that he needed medication,
and only agreed to take one medication, which Stone was not sure was working. 
Stone stated that there was no other alternative treatment and that antipsychotics,
anxiolytics, sedatives, hypnotic mood stabilizers, and antidepressants would be in
K.E.W.’s best interest. 
          K.E.W. then testified that he thought that doctors were trying to keep him away
from the real medicine he needed—his “displaced family and friends that [he] had
come from far away to see and a large group of those individuals that they’re referring
to.” That was the “real medication that [would] heal [his] heart, mind, body and
soul.” He stated that it was wrong for someone to tell him that his belief system was
not correct and that he was tired of coming to court “over a period of time from
dimension to dimension,” having his feelings put on trial, being sent to a hospital, and
being forced to take medications to try to make him forget his feelings. He spoke of
medicines that he had taken before that he felt helped him, and stated that the
antipsychotics did not change his point of view, which was what “this is about” and
which was “not right.” He explained that he had had these feelings for decades
having gone through “multidimensional realities after being over it.” He told the
court that he did not have schizophrenia, but did have major depression and post-
traumatic stress disorder, and wanted to take two particular medicines. He insisted
that he did not have delusions.
          The trial court granted the order to administer psychoactive medication.


 Order for Temporary Commitment
A.     Burden of Proof
          Before a trial court may render an order for temporary, involuntary
commitment, it must find, from clear and convincing evidence, that 
          (1)     the proposed patient is mentally ill; and 
          (2)     as a result of that mental illness, the proposed patient 
                    (A)    is likely to cause serious harm to himself;
                    (B)    is likely to cause serious harm to others; or
                    (C)    is: 
                              (i)      suffering severe and abnormal mental, emotional, or
physical distress; 
 
                              (ii)     experiencing substantial deterioration of the
proposed patient’s ability to function independently,
which is exhibited by the proposed patient’s
inability, except for reasons of indigence, to provide
for the proposed patient’s basic needs, including
food, clothing, health, or safety; and
 
                              (iii)    is unable to make a rational and informed decision
as to whether or not to submit to treatment.
 
Tex. Health & Safety Code Ann. § 574.034(a) (Vernon 2003). The trial court
must specify which criteria listed in subsection (a)(2) form the basis for its decision
per Texas Health and Safety Code section 574.034(c), and appellate review is limited
to the criteria specified by the court. See Johnstone v. State, 961 S.W.2d 385, 388
(Tex. App.—Houston [1st Dist.] 1997, no pet.).
          In order to be clear and convincing for the purposes of subsection (a), the
evidence must include expert testimony and, unless waived, there must be evidence
of either “a recent overt act” or “a continuing pattern of behavior” that tends to
confirm: 
          (1)     the likelihood of serious harm to the proposed patient or others;
or
 
          (2)     the proposed patient’s distress and the deterioration of the
proposed patient’s ability to function.
 
Tex. Health & Safety Code Ann. § 574.034(d) (Vernon 2003). The “recent overt
act or continuing pattern of behavior proven by the State must relate to the criterion
on which the judgment is based.” J.M. v. State, 178 S.W.3d 185, 193 (Tex.
App.—Houston [1st Dist.] 2005, no pet.). 
          While expert testimony is required by the statute, an expert’s diagnosis alone
is not sufficient to confine a patient for compulsory treatment.


 State ex. rel. C.C.,
III, 253 S.W.3d 888, 893 (Tex. App.—Dallas 2008, no pet. hist.); State ex. rel. E.E.,
224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.); State ex. rel. C.O., 65
S.W.3d 175, 181 (Tex. App.—Tyler 2001, no pet.). “A bald diagnosis alone is
insufficient to support commitment.” In re Breeden, 4 S.W.3d 782, 784 (Tex.
App.—San Antonio 1999, no pet.). An expert opinion recommending involuntary
commitment must be supported by a showing of the factual bases on which it is
grounded. C.C., III, 253 S.W.3d at 893; In re F.M., 183 S.W.3d 489, 499 (Tex.
App.—Houston [14th Dist.] 2005, no pet.); J.M., 178 S.W.3d at 193; State ex. rel.
K.D.C., 78 S.W.3d 543, 547 (Tex. App.—Amarillo 2002, no pet.); K.T. v. State, 68
S.W.3d 887, 893 (Tex. App.—Houston [1st Dist.] 2002, no pet.). “The State cannot
meet its burden of proof without presenting evidence of the behavior of the proposed
patient that provides the factual basis for the expert opinion.” E.E., 224 S.W.3d at
794; C.O., 65 S.W.3d at 181. Even though an expert’s opinion may be valid, the
legislature has mandated that more than conclusory opinions by experts are required
before a person may be involuntarily committed for inpatient mental health services. 
See J.M., 178 S.W.3d at 195; In re C.E., 100 S.W.3d 368, 371–72 (Tex. App.—San
Antonio 2002, no pet.); K.D.C., 78 S.W.3d at 547. Evidence of a recent overt act or
continuing pattern of behavior that tends to confirm either the likelihood of serious
harm to the proposed patient or others or the proposed patient’s distress and the
deterioration of the proposed patient’s ability to function is “specifically required by
the Texas Health and Safety Code in addition to expert opinion”


 before an order of
commitment may be rendered.


 F.M., 183 S.W.3d at 494; see also C.E., 100 S.W.3d 
at 369, 371; Tex. Health & Safety Code Ann. § 574.034(d). Evidence that merely
reflects that a person is mentally ill, and in need of hospitalization, does not satisfy
the statutory standard for involuntary commitment and will not be sufficient to meet
the State’s burden. C.C., III, 253 S.W.3d at 893; F.M., 183 S.W.3d at 494; J.M., 178
S.W.3d at 193; G.H. v. State, 96 S.W.3d 629, 634 (Tex. App.—Houston [1st Dist.]
2002, no pet.); K.D.C., 78 S.W.3d at 547; K.T., 68 S.W.3d at 892; C.O., 65 S.W.3d
at 181; State ex. rel. P.W., 801 S.W.2d 1, 3 (Tex. App.—Fort Worth 1990, writ
denied); Johnstone, 961 S.W.2d at 388–90; Broussard v. State, 827 S.W.2d 619, 622
(Tex. App.—Corpus Christi 1992, no writ).
          Nor is the State’s burden met by testimony of “possible” or “potential” harm
to the proposed patient or others. See J.M., 178 S.W.3d at 196; State ex. rel. L.C.F.,
96 S.W.3d 651, 657 (Tex. App.—El Paso 2003, no pet.); C.O., 65 S.W.3d at 181–82;
Broussard, 827 S.W.2d at 622. Rather, when the State alleges that a proposed patient
may harm himself or others, it must provide proof, by clear and convincing evidence,
that the proposed patient is likely to do so. See C.O., 65 S.W.3d at 181–82; P.W., 801
S.W.2d at 3. There must be a substantial threat of harm, based on actual dangerous
behavior, manifested by some overt act or threats in the past. See J.M., 178 S.W.3d
at 193; K.D.C., 78 S.W.3d at 547; Taylor v. State, 671 S.W.2d 535, 538 (Tex.
App.—Houston [1st Dist.] 1983, no writ). 
B.      Legal Sufficiency to Support the Temporary Commitment Order

          In reviewing a “no evidence,” or legal insufficiency, claim in the case of a
temporary involuntary commitment, because of the heightened clear-and-convincing
burden of proof in the trial court, we apply an elevated appellate standard of review. 
J.M., 178 S.W.3d at 190–92. We must “look at all of the evidence in the light most
favorable to the finding to determine whether a reasonable trier of fact could have
formed a firm belief or conviction that its finding was true.” In re J.F.C., 96 S.W.3d
256, 266 (Tex. 2002). In doing so, we must give appropriate deference to the fact
finder’s conclusions, and we must “assume that the factfinder resolved disputed facts
in favor of its finding if a reasonable factfinder could do so.” Id. Therefore, we
“should disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible,” though we do not disregard undisputed facts that do
not support the finding. Id. In support of its order for temporary involuntary
commitment, the trial court stated that it found, by clear and convincing evidence,
that K.E.W. was mentally ill, and made positive findings under subsections (a)(2)(B)
and (C)(i),(ii),(iii).
          K.E.W. asserts that there is no evidence, or insufficient evidence, to support
either the finding that he is mentally ill or the findings under subsections (a)(2)(B)
and (C)(i),(ii),(iii). He specifically argues that the two testifying doctors disagreed
on his diagnosis of mental illness


 and that evidence of bizarre beliefs and irrational
thoughts was not necessarily evidence of mental illness. He also asserts that there
was no evidence of an overt act or continuing pattern of behavior that tends to
confirm the likelihood of serious harm to others or his distress and the deterioration
of his ability to function. He contends that neither doctor testified that he had made
any sexual advances toward women at the hospital and that Dr. Stone testified that
there was no evidence that K.E.W. would do anything to women against their will. 
He argues that the behavior testified to by Drs. Stone and Ortiz was merely evidence
of mental illness, not of an overt act or a continuing pattern of behavior
demonstrating his distress and deterioration of his ability to function. 
          The State responds that the evidence is uncontroverted that K.E.W. is suffering
from schizophrenia, is living “in a delusional state under the belief he has been
abducted by aliens who have tasked him with creating new superior races by
impregnating a select group of females,” which included “one of the women working
at the very Gulf Coast Center he was treated at,” and that “when he came looking for
her he was prevented by physical intervention of the staff of law enforcement.” The
State further argues that the evidence established that the “acute distress of K.E.W.’s
condition was that he had deteriorated to the point he was unable to comprehend the
reality of his illness or treatment; his ability to care for himself was evidenced by his
disheveled dress and the socks he had been wearing for weeks.” The State contends
that “the deterioration of KEW’s conduct to the point he was apparently looking for
one of the women, identified to him by the aliens for the creation of a superior race,
at the MHMR Center and his diminished ability to clothe himself properly,” was
sufficient to support the order of commitment.
          We consider first the trial court’s finding under section 574.034(a)(1) that
K.E.W. was mentally ill. Reviewing the evidence in the light most favorable to the
trial court’s findings, we hold that a reasonable trier of fact could have formed a firm
belief that its finding that K.E.W. was mentally ill was true. We therefore hold that
the evidence was legally sufficient to support that finding.
           We next consider the legal sufficiency of the evidence under section
574.034(a)(2) to demonstrate either that K.E.W was likely to cause serious harm to
others,


 or that he was suffering severe and abnormal mental, emotional, or physical
distress and experiencing substantial deterioration of his ability to function
independently. To demonstrate the latter, the evidence must exhibit K.E.W’s 
inability, except for reasons of indigence, to provide for his basic needs, including
food, clothing, health, or safety and was unable to make a rational and informed
decision as to whether or not to submit to treatment.


 
          Review of the record indicates that very little evidence was presented on the
issue of an overt act or continuing pattern of behavior confirming K.E.W.’s distress
and the deterioration of his ability to function. The State cites as evidentiary support
the fact that K.E.W. was disheveled and was wearing the same socks for weeks as
proof of a diminished ability to clothe himself properly. But these facts were not
cited as support by either Dr. Stone or Dr. Ortiz,


 neither of which spoke to the
question of K.E.W’s ability to function independently or to provide for his basic
needs. “[P]oor grooming is insufficient ‘to justify depriving an individual of her
liberty,’” and poor hygiene, while demonstrative of mental illness, does not, in itself
“rise to the level of an overt act or pattern of behavior that confirms a substantial
deterioration of a person’s ability to function independently to provide for her basic
needs.” See Armstrong v. State, 190 S.W.3d 246, 252 (Tex. App.—Houston [1st
Dist.] 2006, no pet.), citing to J.M., 178 S.W.3d at 195 (holding that patient’s refusal
to bathe and brush her teeth did not rise to level of sufficient act or pattern of
behavior to support court ordered mental health services). Section
574.034(a)(2)(C)(ii) requires a showing of the deterioration of a proposed patient’s
ability to function independently, which is exhibited by the proposed patient’s
inability, except for reasons of indigence, to provide for the proposed patient’s basic
needs, including food, clothing, health, or safety. The only questions posited to either
doctor in reference to the requirements of section 574.034(a)(2)(C)(ii) was one to 
Stone by the State, asking if he thought, given K.E.W.’s delusions, K.E.W. was
capable of functioning independently in the community, to which Stone answered that
he did not, and then one to Stone by K.E.W., asking why the doctor felt K.E.W. was
not capable of functioning independently, to which the doctor replied that K.E.W. did
not believe or understand that he had a mental illness and was focused on his
delusions about the women. Neither response provides any facts that exhibit
K.E.W.’s inability to provide for his basic needs.
          On the record before us, there was no evidence of an overt act or continuing
pattern of behavior that confirmed K.E.W.’s deterioration of his ability to function
independently as exhibited by his inability to provide for his basic needs. 
Accordingly, we hold that, on the evidence in this record, a reasonable trier of fact
could not have formed a firm belief or conviction that such finding was true, and we
hold that the evidence was legally insufficient to support the trial court’s finding
under section 574.034(a)(2)(C). 
          Lastly, we turn to the trial court’s finding under section 574.034(a)(2)(B), that 
K.E.W. was likely to cause serious harm to others. K.E.W. argues that there is no
evidence, or insufficient evidence, of a recent overt act or continuing pattern of
behavior to support the likelihood of him causing serious harm to others, noting that
he denied having any intent to impregnate women against their will, and citing a lack
of evidence that he had made any sexual advances toward women at the hospital. The
State responds that he went looking for one of the women he was interested in
impregnating and was prevented from contacting her only through physical
intervention. 
          We first note that the evidence of K.E.W.’s ongoing psychotic behavior itself
does not support the statutory requirement of a recent overt act or continuing pattern
of behavior that tends to confirm that K.E.W. is likely to seriously harm others. 
“Texas courts universally hold that the State must show more than delusions, angry
or psychotic behavior, or other facts that merely confirm mental illness” in order to
“establish the requisite [recent] overt act or continuing pattern of behavior” required
by section 574.034(d). C.O., 65 S.W.3d at 182 (holding that evidence of “continuing
delusional behavior, hostile behavior, and provocative statements to others” merely
reflected that an individual was mentally ill and in need of hospitalization, but did not
provide the continuing pattern of behavior necessary to support involuntary
commitment); see also C.C., III, 253 S.W.3d at 893; F.M., 183 S.W.3d at 494; J.M.,
178 S.W.3d at 193; G.H., 96 S.W.3d at 634; K.D.C., 78 S.W.3d at 548–51; K.T., 68
S.W.3d at 892; Johnstone, 961 S.W.2d at 388–90; Broussard, 827 S.W.2d at 622;
P.W., 801 S.W.2d at 3. 
          Nor does the testimony from Dr. Ortiz and Dr. Stone provide sufficient factual
bases to meet the statutory requirement. 
          In discussing his opinion that K.E.W. could be a danger to others, Stone
expressed a concern that K.E.W. would act on his delusions, try to impregnate a
woman if he found one whom he thought was promised to him, and would not
appreciate whether a particular women wished to be impregnated. To support his
opinion, Stone cited the beliefs expressed by K.E.W. and his adherence to them, and
the fact that Dr. Pugh thought K.E.W. so threatening that he should be immediately
admitted to the hospital. Stone admitted that K.E.W. said that he was not planning
on impregnating anyone against her will, and as far as Stone knew, K.E.W. took no
concrete steps to find the women.  
          Ortiz expressed concern about the “potential dangerousness” of K.E.W.’s
behavior. Ortiz stated that she “[did not] know,” if K.E.W. were to find the women
he was seeking, “whether the sexual interaction would be consensual or not,” but
admitted that K.E.W. did not say that he intended to impregnate anyone against her
will and did not make any sexual advances toward anyone on the staff. Ortiz also
said that she “[did not] know” if K.E.W. would understand that “no” meant “no,”
because he was “very intrusive” and had “invaded [her] space” on several occasions
when he was stressing his need to leave the facility. Ortiz was also concerned with
K.E.W.’s belief that he received information from brain waves and special abilities
and said that she “[did not] know” whether, if K.E.W. perceived or misperceived
certain information, K.E.W. might “get very angry or agitated.” The doctor testified
that K.E.W. became agitated at the unit when he believed that he had just missed the
women and thought that the doctor and nurses had conspired against him. Ortiz did
not indicate that K.E.W. harmed, or threatened to harm, anyone during the incident. 
Ortiz expressed concern that if K.E.W. were outside of a hospital environment,
“perhaps something would happen” and she “wasn’t convinced that it would not.”
           Neither doctor was present at the Gulf Coast Medical Center at the time K.E.W.
was taken into custody and neither pointed to any specific actions taken by K.E.W.
at the center as a basis for rendering an opinion.


 Stone cited the incident at the
center as a behavior by K.E.W. that made him believe that K.E.W. could be a harm
to others, but merely described that K.E.W. had an MHMR appointment, had met
with Pugh, and had been so threatening that Pugh felt that K.E.W. needed to be
immediately admitted to the hospital. Stone did not testify about the specific actions
that K.E.W. had taken which caused Pugh to feel that K.E.W. was a threat, nor did
Stone testify that any such specific actions caused Stone to believe that K.E.W. was
likely to cause serious harm to others. Ortiz did not refer to the specific incident at
all while stating her opinion.
          While K.E.W’s beliefs and mental illness certainly give rise to the potential of
harm to others, in order to support commitment, the threat of harm must be substantial
and based on actual dangerous behavior manifested by some overt act or threats in the
past. See J.M., 178 S.W.3d at 193; K.D.C., 78 S.W.3d at 547; Taylor, 671 S.W.2d at
538. “Potential” harm is not sufficient to deprive a person of his liberty. See J.M.,
178 .S.W.3d at 196; L.C.F., 96 S.W.3d at 657 (holding that “an opinion of a ‘potential
danger’ to others is not sufficient to support a commitment under this standard”); 
C.O., 65 S.W.3d at 181–82 (holding that “[b]are psychiatric expert opinion of a
potential danger to others is insufficient to support a commitment” and there must be
facts in record to justify conclusion that appellant was likely to cause serious harm);
see also Broussard, 827 S.W.2d at 622 (holding that bare psychiatric expert opinion
of “potential danger” to others insufficient to support commitment). Thus K.E.W.’s
beliefs, and his adherence to them, and his psychotic behavior, while indicative of
mental illness, are not sufficient in themselves, to constitute an “overt act” or
“continuing pattern of behavior” that would support a finding that he was likely to
cause serious harm to others. 
          Remaining as a possible overt act confirming the likelihood that K.E.W. would
cause serious harm to others—and the one most relied on by the State—is K.E.W’s
conduct at the Gulf Coast Center MHMR. Review of the record indicates significant
gaps in the evidence related to this incident. The record suggests that K.E.W. made
a statement of a sexual nature to the woman at the center but the record does not
contain the statement and the question itself was struck from the record. Likewise, the
record does not contain a complete description of the actual sequence of events at the
center and, in particular, does not contain a description of the specific actions taken
by K.E.W. that caused the staff to take the actions that they did. Although one witness
was asked why it was necessary to protect the female staff member from K.E.W., the
response was struck from the record. There is, accordingly, no evidence in the record
on appeal of the particular actions on the part of K.E.W. that caused the staff to feel
that K.E.W. was a threat. What remains in the record is that K.E.W. went to Gulf
Coast Center MHMR; was agitated and pacing; was vehemently insistent on
contacting a female worker whom he identified, at some unspecified point, as one of
the women he believed he should impregnate as part of his mission to create a superior
race; was uncooperative and attempted to interfere with female staff even though
directed otherwise; exhibited paranoid behavior; and the staff was fearful enough to
seclude the object of his interest and felt that appellant was a sufficient threat to call
the police to escort him away. 
          The record before us establishes that appellant was mentally ill and suffered
from serious delusions that might potentially result in serious harm to others if carried
out. It establishes that K.E.W. attempted to contact one of the women regarding whom
he had a delusion and that the women’s co-workers felt that K.E.W. was a threat. But
the record does not establish specific overt acts or a continuing pattern of behavior by
appellant that would tend to confirm that appellant was likely to sexually assault the
female staff member or cause any kind of serious harm to others. 
           The evidentiary standards for involuntary commitment are high, E.E., 224
S.W.3d at 794, because involuntary commitment is a drastic measure. C.O., 65
S.W.3d at 182. To justify depriving an individual of his liberty, more than “potential”
harm is necessary. C.O., 65 S.W.3d at 182. That a person may be a potential danger
is insufficient to support commitment under the statute. J.M., 178 S .W.3d at 196;
L.C.F., 96 S.W.3d at 657; C.O., 65 S.W.3d at 181–82; Broussard, 827 S.W.2d at 622;
Taylor, 671 S.W.2d at 538. The evidence in the record before us does not rise to the
level of clear and convincing evidence that K.E.W. was likely to cause serious harm
to others.


 We hold that, on the record before us, a factfinder could not have
reasonably formed a firm belief that its finding that K.E.W. was likely to cause serious
harm to others was true. Cf. J.M., 178 S.W.3d at 193–94 (discussing how no specific
details were provided about threats of suicide, such as when threats were made, to
whom, under what circumstances, or their severity). We therefore hold that the
evidence was legally insufficient to support the trial court’s finding under section
574.034(a)(2)(B) and sustain K.E.W.’s first issue to the extent that it challenges the
legal sufficiency of the temporary commitment order. Having so found, we need not
consider K.E.W.’s challenge to the factual sufficiency of the evidence supporting the
order. See M.S. v. State, 137 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2004,
no pet.).
Order to Administer Psychoactive Medication
          K.E.W. also contends that if the commitment order is reversed, the order to
administer psychoactive medication cannot stand because an order authorizing the
administration of psychoactive medication may be entered only if the patient is under
a valid order for temporary or extended services. See Tex. Health & Safety Code
Ann. §574.106(a)(1) (Vernon Supp. 2008). This is correct; without a valid order for
temporary or extended mental health services, the order authorizing the administration
of psychoactive medications is not authorized by statute. Id.; C.C., III, 253 S.W.3d
at 895; Breeden, 4 S.W.3d at 790. Because we reverse the trial court’s order of
temporary commitment, we also reverse the order to administer psychoactive
medications to K.E.W. and sustain K.E.W.’s first issue to the extent that it challenges
the medication order. We therefore do not consider K.E.W.’s factual sufficiency
challenge to this order. M.S., 137 S.W.3d at 137.
Conclusion
          We reverse the judgment of the trial court ordering temporary impatient mental
health services and the order to administer psychoactive medications and render
judgment denying the State’s applications to commit K.E.W. for court-ordered
temporary mental health services and to administer psychoactive medications to
K.E.W.
 
 
Tim Taft
Justice
 
Panel consists of Justices Taft, Keyes, and Alcala.
 
Justice Keyes, dissenting.