OPINION

YVONNE T. RODRIGUEZ, Justice.
Appellant D.L.S. seeks reversal of the trial court’s judgment subjecting him to 90 days of temporary mental health institutionalization, contending in his sole appellate issue that the evidence underpinning the jury’s findings that he (1) was incapable of caring for himself, (2) was incapable of making informed medical decisions, and (3) posed a threat of harm to himself were legally and factually insufficient. We reverse and render in part, and reverse and remand in part.
BACKGROUND

Factual History

At the time of his mental health commitment, Appellant was a forty-three-year-old, college-educated male receiving disability payments for bipolar disorder, a condition for which he had previously been hospitalized in 1999. In the summer of 2018, Appellant abandoned his Boulder, Colorado, apartment and, with the help of his mother in Illinois, purchased a Toyota Prius and a motorcycle. He then constructed a makeshift trailer, placed all his belongings inside, and began to travel from Illinois to New York before eventually deciding to drive through the national parks and forests in Colorado. Appellant testified that he lived out of his Prius by “car camping” in national park campground areas and in Walmart parking lots for up to fourteen days at a time, showering and exercising at 24-Hour Fitness locations and at campgrounds, and purchasing food and supplies with the Social Security disability money he 'received for his bipolar disorder. Appellant explained during his long, rambling narrative testimony at trial[1] that he “was having the time of my life” and that he believed touring in his car was “preferable to sitting in an apartment and staring at the TV and, you know, cooking — microwaving a pizza or something like that .... ” When the weather in Colorado became colder, Appellant headed south and began traveling throughout New Mexico, repeating his Colorado routine on land owned by the Bureau of Land Management.
In early 2014, Appellant was riding his motorcycle off-road through sand dunes in the Red Sands Recreational Area near Alamogordo, New Mexico, when he was involved in a serious collision with another motorcyclist. At the time of the accident, Appellant was wearing a heavy leather jacket, a riding helmet, kneepads with “leg safety gear,” gloves, several layers of clothing, and Caterpillar work boots. Appellant testified that a group of motor cross bike riders were driving on the wrong side of the trail, and that one collided directly into him. Appellant testified that because the other riders were not following standard safety protocol, and because the driver who hit him seemed to jump directly at him, he suspected foul play and that the crash was intentional on their part.
Appellant broke his jaw and kneecap and shattered his right femoral head, *511 which is the part of the femur bone that connects the upper leg to the hip. An ambulance transported him to a hospital in Alamogordo, where he was subsequently flown by helicopter to University Medical Center (UMC) in El Paso. Appellant initially offered to follow the ambulance in his car based on his concern about leaving his equipment and motorcycle at Red Sands, but paramedics refused to let him drive based on the severity of his injuries.
Following Appellant’s motorcycle crash, Appellant’s father flew in from Maryland and filed an emergency order to have Appellant committed to a mental institution based on the fact that Appellant “has expressed his belief that I and his immediate family were involved in orchestrating his accident[,]” claimed “that he is the Messiah[,]” and believed that his family “has caused all his problems over the past few years .... ” Appellant’s father also stated that Appellant’s “paranoia” prevented him “from eating[,]” taking “normal nourishment[,]” or “accepting the fact that he is seriously injured.” Appellant’s father further stated that Appellant expected to be able to leave the hospital within a few days and drive his car in spite of the severity of his injuries. The probate court issued a warrant for detention, and Appellant was transferred from UMC to the El Paso Psychiatric Center (EPPC) pending hearing.

Procedural History and Trial Testimony

The State’s Case
Appellant elected to be tried by jury and to represent himself pro se, with occasional help from his court-appointed attorney ad litem. The State presented five witnesses. Dr. Amr Abdelgawad, an orthopedic surgeon with UMC, testified that he performed surgery on Appellant following the accident. Dr. Abdelgawad repaired the damage to Appellant’s femoral head with screws and metal plates, but noted that due to the severity of the injuries, there was at least a 50 percent chance the repairs would fail, the upper part of the femur bone would die, and Appellant would need a total hip replacement. Dr. Abdelgawad gave Appellant a “fair” prognosis, assuming that he followed a three-month physical therapy regimen. He also testified Appellant would need more physical therapy before he could drive, and that usually, patients were not released to drive for at least nine weeks after surgery. However, Appellant would not be precluded from taking an airplane or a train to Denver for follow-up treatment elsewhere if he wished. Dr. Abdelgawad did not believe Appellant posed a threat of harm to himself or others.
Dr. Henry Weisman, director of both Texas Tech University’s psychiatric resident program and UMC’s psychiatric consultation liaison program, testified that he received two requests for a psychiatric consult for Appellant — first, from Appellant’s family, and second, from UMC staff after Appellant claimed he was the Messiah. Dr. Weisman interviewed Appellant’s mother, father, and brother, who all consistently told him that Appellant had been diagnosed with either bipolar disorder or schizophrenia for at least fourteen years, that he had “multiple difficulties with inpatient psychiatry and the legal system,” was not medication-compliant, and he had an overall decline in functioning. Dr. Weis-man diagnosed Appellant with bipolar disorder, manic phase with psychotic features, ruling out paranoid schizophrenia. He explained that he came to his diagnosis through interviews in which Appellant exhibited flight of ideas, pressured speech, circumstantiality, and tangentiality. For example, Appellant rapidly quoted Bible verses and talked at length about how he *512 was the true Messiah because Jesus had died and abandoned his people while Appellant was still alive. Appellant also expounded on his belief that his mother had sodomized his pet cat because its anus was speckled and expressed frustration that local police and the Federal Bureau of Investigations would not press charges against her. Dr. Weisman confirmed that Appellant’s method of speech and questioning at trial further exhibited all these symptoms to the jury in real time. Dr. Weisman testified that Appellant refused certain medications. Dr. Weisman also stated that he believed Appellant’s abandonment of his apartment in favor of a nomadic road-trip lifestyle could best be understood as part of a manic episode that, if left untreated, would cause further deterioration in Appellant’s quality of life. Dr. Weisman opined that Appellant’s plan to either return to Colorado and self-medicate with medical marijuana or else continue on his road trip was unrealistic and showed poor insight and judgment into the extent of his injuries, noting that marijuana was contra-indicated for patients with bipolar disorder. Dr. Weisman conceded that Appellant was not suicidal and had not attempted to harm either himself or hospital staff. Because Appellant lacked insight into the severity of his injuries, because academic literature suggested that trauma victims with psychiatric disorders have a poor prognosis of following up on their physical treatment generally, and because bipolar disorder creates cognitive distortions, Dr. Weisman recommended Appellant continue with inpatient psychiatric care.
Dr. Sandra Vexler, a psychiatry resident at Texas Tech who also examined Appellant, confirmed Dr. Weisman’s diagnosis of bipolar disorder, adding that she also believed Appellant had polysubstance dependence and cannabis dependence. She testified that he refused psychiatric medications and did not appear to understand the gravity of his injuries, rendering him a danger to himself. She stated that Appellant believed that his mother had deliberately tried to get him sick in the hospital by kissing him and vomiting in his room when she apparently had food poisoning. She also testified that his communication difficulties could be perceived as threatening by others, further placing him at risk of harm. She admitted that Appellant was not suicidal, but believed he was a threat to others because he would try to drive using his still-healing leg without appreciating the severity of his injuries. She also stated that Appellant could not function independently unless he was committed.
Dr. Ames Marquez, Appellant’s treating psychiatrist at EPPC, testified that he interacted with Appellant on a nearly-daily basis following Appellant’s initial commitment. Dr. Marquez further testified that Appellant declined to take psychiatric medications and Lovenox, a blood thinner, but that he accepted pain medication. Dr. Marquez believed that Appellant would not adequately take care of his medical needs due to lack of insight into his physical state following the accident, but that Appellant could take care of his basic needs for food, clothing, and shelter. Dr. Marquez stated that Appellant was not suicidal and had not tried to harm himself or others. Dr. Marquez diagnosed Appellant with bipolar disorder and recommended continued inpatient treatment.
Finally, Appellant’s father testified for the State. Appellant’s father admitted that he and Appellant had an estranged relationship. According to Appellant’s father, Appellant was diagnosed with bipolar disorder in 1999, following his involuntary commitment to a mental hospital in Illinois. The details of the 1999 commitment are unclear from the record. Appellant’s *513 father confirmed Appellant receives Social Security benefits for bipolar disorder. During his El Paso hospitalization, Appellant instructed his father to only bring him sealed beverages and to keep his brother away from the room, since Appellant believed that his brother had urinated on his eye drops in the past and did not want him to contaminate anything else while he was in the hospital. Appellant’s father testified that he believed Appellant could not make rational medical decisions and that he was a threat to himself by refusing medical care. Appellant’s father conceded that Appellant had never attempted or threatened suicide, nor had he physically harmed anyone else.
Appellant’s Case
Appellant presented two EPPC employees as witnesses in his defense: Leonor Villalobos, a physician nurse assistant, and Humberto Beltran, a registered nurse. Both Villalobos and Beltran testified that Appellant did not attempt to harm himself or others while at EPPC. Villalobos testified that she did not think Appellant was a threat to himself or others. Beltran testified that he believed Appellant’s refusal of medical treatment was harmful, but that he did not believe Appellant was an immediate threat of harm to himself or others.
Appellant also testified in his own defense in narrative form. Among the other topics previously discussed in the factual history section above, Appellant denied having any desire to harm himself or others.
Verdict
In a split 5-1 verdict, the jury found that Appellant was mentally ill, that there was evidence of a recent overt act or pattern of behavior tending to confirm a likelihood of serious harm or D.L.S.’s distress and deterioration, that D.L.S. was likely to cause serious harm to himself as a result of mental illness, that D.L.S. has suffered severe distress from the mental illness, that he has experienced a deterioration of his ability to function independently, and that he was unable to make a rational and informed decision as to whether or not to submit to treatment. The jury found that D.L.S. was not a threat to others. The trial court entered judgment on the verdict, and D.L.S. appealed.
DISCUSSION
The question before this Court is whether the jury erred in finding that Appellant’s bipolar disorder so occluded his ability to understand the nature and severity of his injuries that he posed a danger of serious harm to himself and could not meaningfully care for himself or consent to medical treatment. Mindful of our deference to the jury in matters of credibility, demeanor, and determinations of historical fact, we nevertheless conclude that the jury’s verdict rested on legally and factually insufficient evidence.

Jurisdiction

Subject-matter jurisdiction is fundamental to this Court’s authority to dispose of cases, and we may raise the issue sua sponte at any time. Juarez v. Tex. Ass’n of Sporting Officials El Paso Chapter, 172 S.W.3d 274, 277-78 (Tex.App.-El Paso 2005, no pet.). Mootness defeats a court’s subject-matter jurisdiction over a particular controversy. Beltran v. Beltran, 324 S.W.3d 107, 110 (Tex.App.-El Paso 2010, no pet.). As a threshold matter, we note that as the result of continuances requested by both parties on appeal, Appellant’s involuntary commitment orders have already expired, and Appellant appears to have returned back to Colorado. We nevertheless retain jurisdiction over this case, as the mootness *514 doctrine does not apply to temporary mental health orders due to the collateral consequences and stigma that flow from an involuntary commitment order. State v. K.E.W., 315 S.W.3d 16, 20 (Tex.2010).

Standard of Review

“[D]ue process demands clear and convincing proof before the state may involuntarily confine a person in a mental institution.” In re C.H., 89 S.W.3d 17, 22 (Tex.2002); see also Addington v. Texas, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). As such, mental health commitment suits are governed by the clear and convincing evidence burden of proof, and not the lower preponderance of the evidence standard generally applicable to civil suits at large. See Tex.Health & Safety Code Ann. § 574.034 (West Supp.2010).
This elevated standard of proof at trial triggers a reciprocal change in how the court treats legal and factual sufficiency points on appellate review. In re J.F.C, 96 S.W.3d 256, 266 (Tex.2002). Both standards of review embrace the ultimate issue of whether the evidence presented at trial would enable a reasonable fact finder to form “a firm belief or conviction that the finding was true.” K.E.W, 315 S.W.3d at 20. The difference between the two standards is in how we approach the record evidence in relation to that question. In re J.F.C., 96 S.W.3d at 266.
In a legal sufficiency review where the burden of proof at trial is clear and convincing evidence, the operative question on appeal is whether all evidence, when viewed in the light most favorable to the finding, would enable a reasonable fact finder to form a firm belief or conviction that the finding was true. Id.; K.E.W, 315 S.W.3d at 20. “Evidence that merely exceeds a scintilla is not legally sufficient when the burden of proof is clear and convincing.” K.E.W., 315 S.W.3d at 20. We presumptively resolve any evidentiary disputes in favor of the finding and disregard all contrary disputed evidence unless a reasonable fact finder could not do so. In re J.F.C., 96 S.W.3d at 266. We are not free to disregard undisputed facts in our analysis. Id.
In reviewing a clear-and-convincing-evidence finding for factual sufficiency, we assess whether the record evidence as a whole “is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State’s allegations.” In re C.H., 89 S.W.3d at 25. Although we “give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing[,]” we do not presumptively resolve factual disputes in the finding’s favor as in a legal sufficiency challenge. In re J.F.C., 96 S.W.3d at 266. Instead, where we determine “a reasonable factfinder could not have resolved that disputed evidence in favor of its finding[,]” and where “the disputed evidence that a reasonable factfin-der could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction[,]” we must grant an appellant’s factual insufficiency point. Id. When we grant a point on factual sufficiency grounds, we “should detail in [our] opinion why [we have] concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.” Id. at 266-67.

Involuntary Commitment:

Applicable Law

Before the trial court may commit a proposed patient to involuntary, temporary inpatient mental health treatment, the court must make two statutory determinations — one “medical,” one legal. See In re F.M., 183 S.W.3d 489, 494 (Tex.App.-Hous *515 ton [14th Dist.] 2005, no pet.). First, the party seeking commitment must satisfy the medical prong of the statute by proving the proposed patient is mentally ill. Tex.Health & Safety Code Ann. § 574.034(a)(1). Second, the party must also establish a nexus between the patient’s mental illness and one of three statutorily enumerated criteria, Tex.Health & Safety Code Ann. § 574.034(a)(2); namely, that the patient poses a risk of serious harm to himself, Tex.Health & Safety Code Ann. § 574.034(a)(2)(A); the patient poses a risk of serious harm to others, Tex.Health & Safety Code Ann. § 574.034(a)(2)(B); or that the patient is suffering from severe and abnormal mental, emotional, or physical distress, with a concomitant deterioration of the ability to function independently and an inability to make “a rational and informed decision as to whether or not to submit to treatment.” Tex.Health & Safety Code Ann. § 574.034(a)(2)(C)(i)-(iii).
Proof of nexus between the medical and legal prongs is vital, and failure to establish anything beyond the mere existence of mental illness is insufficient to justify inpatient commitment over objection. See T.G. v. State, 7 S.W.3d 248, 252 (Tex.App.-Dallas 1999, no pet.) (psychotic behavior alone insufficient to justify commitment on deterioration grounds); Broussard v. State, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ) (same). Likewise, proof that a patient’s mental illness would improve from hospitalization and treatment, standing alone, is insufficient to support involuntary commitment. State ex rel. J.W., 312 S.W.3d 301, 306 (Tex.App.-Dallas 2010, no pet.). To meet its burden, the State must prove the nexus with expert testimony and show the existence of a recent overt act or continued pattern of behavior, unless that requirement is waived by the proposed patient. Tex. Health & Safety Code Ann. 574.034(d). “A recent overt act by a proposed patient ‘tends to confirm’ that the patient poses a likelihood of serious harm to himself if the overt act is to some degree probative of a finding that serious harm is probable, even though the overt act itself may not be dangerous.” State ex rel. R.P., — S.W.3d —, —, 2014 WL 2447470, at *4 (Tex.App.-El Paso May 30, 2014, no pet). Words can constitute “overt act” under the statute. K.E.W., 315 S.W.3d at 22 (schizophrenic patient’s statements that he wanted to impregnate specific hospital staff members to create a master race constituted overt acts).

Analysis

At the outset, we note that Appellant, in his brief, does not appear to challenge the jury’s finding that he is mentally ill, nor could he, on this record. Appellant’s father testified that Appellant was diagnosed with bipolar disorder in 1999, and although Appellant disputes his diagnosis, he acknowledges that he was committed for the condition and that he receives Social Security disability benefits for bipolar disorder. Drs. Weisman, Vexler, and Marquez all diagnosed Appellant with bipolar disorder, manic phase with psychotic features. No other medical experts contradicted their testimony on this point. Assessing this evidence both in a light most favorable to the jury’s verdict and in a neutral light, we find that the medical prong of the statute has been satisfied. There is legally and factually sufficient evidence that Appellant is mentally ill as defined by the Health and Safety Code.
Thus, we address the second prong and turn to the legal and factually sufficiency of the jury’s findings that Appellant was a serious danger to himself under the first statutory ground, and that he is suffering from severe distress, a deterioration in the *516 ability to live independently, and is unable to make medical decisions under the third statutory ground.
Statutory Ground # 1: Danger to Self
A proposed patient may be committed to inpatient mental health treatment over objection where clear and convincing evidence shows that by virtue of mental illness, the patient “is likely to cause serious harm to himself[.]” Tex. Health & Safety Code Ann. § 574.034(a)(2)(A). “A threat of harm to the patient or others must be substantial and based on actual dangerous behavior manifested by some overt act or threats in the recent past.” In re State ex rel. K.D.C., 78 S.W.3d 543, 547 (Tex.App.-Amarillo 2002, no pet.).
The State maintains that the severity of Appellant’s injuries coupled with his lack of insight, his desire to continue driving on a severely injured leg, his choice to live nomadically in remote locations away from family, and his stated intent to “self-medicate” using contraindicated marijuana upon his return to Colorado all constituted recent overt acts that justified his involuntary mental health commitment. In assessing the record evidence in the light most favorable to the jury’s finding, disregarding evidence to the contrary, we agree that there is legally sufficient evidence to support a finding that Appellant is a danger to himself. All three psychiatric experts expressed their belief that Appellant did not fully appreciate the extent of his leg injury due to his mental illness, and Dr. Vexler explicitly stated that she feared Appellant would attempt to drive using his broken leg. Based on this evidence, the jury had legally sufficient evidence to conclude that Appellant presented a threat to himself because he was delusional about the nature of his leg injury, which, coupled with a single-minded desire to drive himself long distances while his severely injured leg was still healing, could lead to him being involved in an automotive collision.
However, in reviewing all record evidence in a neutral light, we find that the evidence supporting the jury’s verdict on this point is factually insufficient for three reasons. Cf. In re J.F.C., 96 S.W.3d at 266 (appellate court must list reasons where it rejects factual sufficiency of evidence). First, both the State’s contention that Appellant had no insight into the severity of his condition and the actual risk that Appellant would drive to Colorado on a broken leg are belied by other record evidence. Appellant expressed concern that he was not receiving physical therapy treatments at the psychiatric center per Dr. Abdelgawad’s orders, and other witnesses confirmed that physical therapy had not started because Appellant refused to sign a consent waiver form and the hospital would not begin treatment without it as a matter of policy. This concern about the status of physical therapy treatments shows that contrary to the State’s assertion, Appellant was aware he was injured and was cognizant of what he needed to do in order to ensure his leg healed correctly. Further, although Appellant told witnesses he would like to try driving in short spurts with one foot if possible, he also acknowledged to medical staff that if that was not reasonable, he would take an airplane or a bus to Colorado for treatment and return to El Paso to retrieve his car and motorcycle from storage later. Dr. Abdelgawad, Appellant’s surgeon, testified that Appellant’s condition would not preclude him from traveling by plane or train. Dr. Vexler expressed concerns that traveling by plane or train could result in an embolism due to lack of movement for a long period of time, but acknowledged that staying in a hospital bed for prolonged *517 periods could also result in the same condition. Taking this evidence in the aggregate, we are not convinced that a jury could form a firm belief that there was a substantial risk that Appellant failed to appreciate the full extent of his injuries and would make a serious attempt to return to Colorado by driving with his broken leg as opposed to opting for other transportation.
Second, while Appellant’s impulse road-trip lifestyle may possibly be indicative of a manic episode, there is no evidence indicating that Appellant exhibited actual dangerous behavior as a result of this mental state. Although we recognize that off-road motorcycle riding could be seen as a dangerous, high-risk activity, the risk must be “substantial” under statute and we may only sanction involuntary commitment based on “actual dangerous behavior.” In re State ex rel. K.D.C., 78 S.W.3d at 547. Appellant testified that he knew the safety protocols and followed them, and the State offered no evidence to the contrary. Further, the trial court accepted Appellant’s stipulation that he wore appropriate gear prior to the accident. This undisputed mitigating evidence suggests that Appellant did not behave recklessly while off-road motorcycling and otherwise dampens the impact of the accident as a nexus between Appellant’s mental illness, his injury, and the risk of future injury to himself.
Third, and most importantly, the evidence undisputedly shows that Appellant is not suicidal. Appellant has never threatened violence against himself, nor has he ever attempted suicide or expressed any form of suicidal ideation. This, coupled with the lack of evidence that he was in bad health, malnourished, involved in violent criminal activity, or otherwise recklessly placing himself into situations where a substantial risk of bodily harm would befall him, weighs heavily in our factual sufficiency determination on this point. See State ex rel J.W., 812 S.W.3d at 306 (finding that patient was not a serious threat of harm to herself because there was no evidence she was in bad health, malnourished, or suicidal); State ex rel L.C.F., 96 S.W.3d 651, 658 (Tex.App.-El Paso 2003, no pet.) (legally sufficient proof of danger to self and deteroriation where patient broke into neighbor’s house because he thought he was being chased by rapper Eminem and police found rotting food on the table of his apartment).
Taking the aforementioned factors into account, we cannot say that the jury could resolve the disputed evidence in favor of a commitment finding under the relevant ev-identiary standard. The jury’s verdict that Appellant was a danger to himself at the time of commitment cannot be upheld as factually sufficient on this ground.
Statutory Ground # 3: Distress, Deterioration, and Medical Decision-Making
We next turn to the alternative basis for the jury’s verdict. A proposed patient may also be committed for treatment based on what is commonly referred as the deterioration ground. To prevail on this ground, the State must show the proposed patient is:
(i) suffering severe and abnormal mental, emotional, or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed patient’s ability to function independently, which is exhibited by the proposed patient’s inability, except for reasons of indigence, to provide for the proposed patient’s basic needs, including food, clothing, health, or safety; and
(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.
*518 TexHealth & Safety Code Ann. § 574.034(a)(2)(C).
The three subparts of this statutory ground are read conjunctively, not dis-junctively. See State ex ret C.C., III, 253 S.W.3d 888, 895 (Tex.App.-Dallas 2008, no pet.) (failure to prove deterioration in ability to function independently defeats basis for commitment). Thus, the State must prove all three subpart conditions are met before the trial court may order involuntary commitment on this ground. Id.
We find that the first subpart— severe mental, physical, or emotional distress — has been satisfied by legally and factually sufficient evidence. However, although Appellant’s choice of a nomadic lifestyle is unconventional, there is no evidence in the record showing that his ability to care for himself has deteriorated from bipolar disorder. Proof of the ability to care for one’s basic needs defeats a deterioration finding even in the presence of serious mental illness symptoms. See State ex rel C.C., III, 253 S.W.3d at 893-94 (graduate student’s delusional beliefs that First Lady Laura Bush wanted him to be “intimate” with her daughters and that he as President of the United States had ordered the army to attack his psychiatrist legally insufficient to justify commitment on deterioration grounds where undisputed evidence showed patient cared for his own basic needs before and during commitment). Here, prior to the accident, Appellant provided for his own shelter by “car camping” in his Toyota Prius, using his Social Security disability benefit money to procure food and supplies and showering at local gyms and campgrounds along his route. Compare State ex rel. R.P., 2014 WL 2447470, at *4-*5 (upholding commitment order where sixty-five-year-old indigent homeless patient who left a shelter and attempted to walk from El Paso to Brownsville was confused, severely malnourished, had a heart disorder, and wandered the desert alone without food or water). At best, the State has proven that deterioration in Appellant’s ability to care for himself, if any, stemmed from his physical injury and not his mental illness. While the evidence suggests that Appellant’s mental illness may present a challenge for the physical healing process, the witnesses’ opinions on whether Appellant could care for himself outside the hospital are too speculative to satisfy the evidentia-ry burden. The evidence on this point is legally insufficient.
There is also legally insufficient evidence showing that Appellant’s mental condition precluded him from exercising reasonable and informed medical decision-making. Appellant readily consented to the initial emergency surgery. Dr. Abdelgawad testified he explained to Appellant the comparative advantages and disadvantages of having what remained of the femoral head and neck repaired with plates and screws versus having a total hip replacement, and that Appellant elected the first option because he was relatively young. He described Appellant as being “very competent” during the consult and stated that Appellant was “asking good questions” and that he and Appellant “went to the decision together” as doctor and patient.
The State points to Appellant’s selective refusal of medication as proof that he was incapable of exercising reasonable medical discretion. Refusal to take medication or participate in medical treatment is not per se evidence of deterioration. See In re F.M., 183 S.W.3d at 493 (bipolar patient’s choice to take some medicines but not others and her refusal to submit to radiation treatment for breast cancer was not legally sufficient evidence that patient represented a threat to herself). In any event, Appellant provided rational explanations for refusing certain medications. He *519 initially refused pain medications during the ambulance ride into Alamogordo because he wanted to stay “lucid” to participate in his own medical care, although he testified that eventually the pain became too unbearable and he ultimately accepted pain medications. Appellant testified that he did not want to continue taking the Lovenox blood thinner because it resulted in numerous bruises on his body. Appellant refused to take the antipsychotic medication Seroquel he was offered because he was afraid it would cause tardive dyskine-sia, which Dr. Marquez confirmed was a known side effect of the medication. Additionally, as we stated before, although Appellant refused to sign a medical liability consent form, he did express concern that he was not receiving the physical therapy treatments his surgeon ordered, which constitutes evidence that he understood the extent of his medical condition and wished to participate in treatment for it.
To the extent the State challenges Appellant’s ability to think rationally from a general standpoint, there is evidence in the record that Appellant suffers from disorganized thinking. Dr. Weisman testified that Appellant’s manner of speech displayed his manner of thought, and that in his professional opinion, Appellant had difficulty placing thoughts in order, became easily distracted on tangents, and showed trouble moving from general topics to specific ones. That being said, we also note that Appellant competently represented himself at trial largely pro se. While he occasionally became sidetracked on extraneous matters and spoke in a rambling, discursive fashion consistent with tangen-tiality and circumstantiality, Appellant also asked mostly relevant questions and brought out information beneficial to his case on cross-examination.
We do not doubt that Appellant suffers from mental illness that colors his choices and affects his thinking, nor do we doubt that Appellant’s family members and treatment team sincerely believe he would benefit from treatment for his psychiatric diagnosis. That being said, we cannot say the evidence here is clear enough to show Appellant was incapable of making decisions for himself and thereby force him into treatment over objection. Our courts are designed to protect patients from making irrational, uninformed medical decisions stemming from mental illness, but when a mentally ill patient capable of appreciating the consequences of his actions makes an unwise medical choice after full deliberation, the courts must stay their hand. See In re F.M., 183 S.W.3d at 498 (“[T]he mere assertion of a person’s liberty interest in refusing medication or other medical treatment cannot be considered an overt act sufficient to meet the clear and convincing standard for involuntary commitment.”). Here, while the record suggests that Appellant may likely make a medically unwise choice, the evidence is legally insufficient to show that Appellant’s mental illness would prevent him from understanding and appreciating his medical decisions and treatment options.

Remedy

Ordinarily, the remedy available to a victorious appellant varies based on whether we sustain his point on legal or factual sufficiency grounds. Marincasiu v. Drilling, 441 S.W.3d 551, 557 (Tex.App.-El Paso 2014, pet. denied). Where the finding is legally insufficient, reversal and rendition are the proper remedies. In re J.F.C., 96 S.W.3d at 266. Where we sustain a factual insufficiency point, “we must reverse and remand.” Marincasiu, 441 S.W.3d at 558; see also Wright Way Spraying Serv. v. Butler, 690 S.W.2d 897, 898 (Tex.1985) (appellate court has no jurisdiction to render judgment on a factual *520 sufficiency point). Appellant has requested rendition in his prayer. Because the jury’s verdict rested on alternate grounds, and because we disposed of each ground for different reasons, we may only render judgment as to the parts of the verdict that we found were legally insufficient, i.e. the second and third elements of the deterioration prong. Although Appellant’s temporary orders have expired and this Court’s jurisdiction survives mootness on technical grounds, it does not extend so far as to allow us to render judgment on the danger-to-self portion of the verdict. Butler, 690 S.W.2d at 898. As such, we must, reverse and remand the factually insufficient portion of the case to the trial court. Id. Issue One is sustained.
CONCLUSION
We reverse the portion of the trial court’s judgment finding that “is suffering severe and abnormal mental, emotional or physical distress; is experiencing substantial mental or physical deterioration of his/ her ability to function independently (which is exhibited by his/her inability, except for reasons of indigence), to provide for his/her basic needs, including food, clothing, health or safety; and is not able to make a rational and informed decision as to whether or not to submit to treatment” and render judgment in favor of Appellant on that issue. We also reverse the danger-to-self portion of the trial court’s judgment and remand for further proceedings consistent with this opinion.

. Appellant represented himself pro se at trial with the assistance of his attorney ad litem.