COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|   |   |   |
|---|---|---|
| | § | No. 08-22-00149-CV |
| THE STATE OF TEXAS | § | Appeal from the |
| FOR THE BEST INTEREST | | |
| AND PROTECTION OF A.R.C. | § | Probate Court No. 2 |
| | § | of El Paso County, Texas |
| | § | (TC# 2022-CMH00771) |

## <u>MEMORANDUM OPINION</u>

This case returns to us on remand from the Texas Supreme Court. On original submission, we vacated the probate court's order committing Appellant A.R.C. for temporary inpatient mental health treatment.[1] *State for A.R.C.*, 657 S.W.3d 585, 595 (Tex. App.—El Paso 2022), *rev'd and remanded sub nom. In re A.R.C.*, 685 S.W.3d 80 (Tex. 2024). Based on our earlier disposition of the appeal, we only reached the first of A.R.C.'s two issues challenging the commitment order. However, the Texas Supreme Court reversed our judgment and remanded the cause to this Court for us to consider A.R.C.'s second issue on appeal. *Id.* at 86. In that issue, A.R.C. challenges the

---

[1] A.R.C. initially brought two issues on appeal. Our ruling on the first issue disposed of the appeal without need to reach the second issue. A.R.C. challenged the qualifications of the two physicians who had filed certified medical examinations (CMEs) in support of the State's application for court-ordered inpatient treatment. *See* Tex. Health & Safety Code Ann. § 574.009(a) (providing that, in counties where a "psychiatrist" is available, that a "psychiatrist" must complete at least one of two required "certificates of medical examination for mental illness."). The Texas Supreme Court reversed our judgment after it concluded the physicians at issue were qualified as "psychiatrists" within the meaning of the applicable statute. *In re A.R.C.*, 685 S.W.3d 80, 86 (Tex. 2024).

legal and factual sufficiency of the evidence supporting the probate court's commitment order. Finding no error, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

The State filed a motion for order of protective custody to detain A.R.C., a proposed patient. Accompanying the motion, Ferney Paez, M.D., included an application for A.R.C. to receive temporary court-ordered mental health services. The application asserted that, because of mental illness, A.R.C.: (1) was likely to cause serious harm to himself; (2) was likely to cause serious harm to others; and (3) was experiencing severe and abnormal mental, emotional, or physical distress, as well as substantial mental or physical deterioration of his ability to function independently to provide for his basic needs, and to make rational, informed decisions as to whether or not to submit to treatment. The pleading was supported by two certificates of medical examination (CMEs), the first signed by applicant, Dr. Paez, and the second signed by Roberto Kutcher-Diaz, M.D. Dr. Paez certified he had diagnosed A.R.C. with bipolar disorder accompanied by a current manic episode, while Dr. Kutcher-Diaz certified he had diagnosed him with bipolar disorder with psychotic features. In opposition, A.R.C. filed a motion to dismiss the application, asserting the statutory requirements for detaining A.R.C. and ordering services had not been met.

The case proceeded to a final hearing held on August 1, 2022, which took place via Zoom. A.R.C. appeared along with his appointed attorney ad litem. The State called Dr. Kutcher-Diaz, who testified he was a psychiatry resident working on the consult-liaison service at UMC trauma hospital.[2] Dr. Kutcher-Diaz recommended A.R.C.'s commitment for inpatient treatment for a

---

[2] At the start of testimony, A.R.C.'s attorney ad litem stipulated on the record that Dr. Kutcher-Diaz was an expert in clinical psychiatry.

2

period not to exceed forty-five days and forced medications. The trial court asked A.R.C. whether he agreed or disagreed. A.R.C. responded that he disagreed.

Dr. Kutcher-Diaz next provided testimony in support of his recommendation. He noted that A.R.C. had continued to present with "psychotic symptoms." He also presented with tangential, disorganized speech. Dr. Kutcher-Diaz further described that A.R.C. had "bizarre delusions." For example, A.R.C. had reported to him that he had an "E-ray in his chest." As of that morning, A.R.C. had made "bizarre statements," stating he did not "need to be in the prison as a devil; and regarding his E-Ray, saying that he would open himself up to us if we would help reorient it."

Regarding treatment, Dr. Kutcher-Diaz described that A.R.C. had felt he did not need medications. He so far had refused medications. Dr. Kutcher-Diaz described that he had developed a working diagnosis of bipolar disorder with psychotic features. He described the psychotic features as stemming from A.R.C.'s disorganized speech and reporting of bizarre delusions. He noted, these features showed he was actively psychotic. Regarding delusions, Dr. Kutcher-Diaz testified: "[A.R.C.] said that . . . he's followed by Cain, as in Cain and Abel." Moreover, "[h]e would make statements saying that he doesn't need to master manifest, that he just needs Adam and Eve[.]"

Dr. Kutcher-Diaz further described that A.R.C. did not have any insight into his mental illness. He explained that a lack of insight of one's own mental illness could affect a person's ability to understand what they were going through, which could cause a person to refuse medication. In turn, the longer a person refused medication, the baseline of the mental illness would progressively worsen. Dr. Kutcher-Diaz thus testified he was concerned that, if A.R.C. were released without treatment, he would not be able to care for himself and he might act on his delusions.

Dr. Kutcher-Diaz described that he also relied on A.R.C.'s medical records in forming his opinion. On arrival at the hospital, the records indicated that A.R.C. complained he was dehydrated. At first, A.R.C. said he had been walking for days or for a week. Yet, prior to the hearing, A.R.C. described that "he was getting hydration for his feet and for his wings." Dr. Kutcher-Diaz said the timeline of A.R.C.'s condition remained unclear due to the difficulty he encountered in obtaining a reliable history from him. He attributed the difficulty to A.R.C.'s level of psychosis and his disorganized thinking.

For example, A.R.C. first said he was trying to get in touch with his family. But more recently he said he did not want anyone calling his family. Dr. Kutcher-Diaz did not know whether A.R.C. had a support system. And no information was known about his living conditions. A.R.C. only reported that he had been walking from place to place. Dr. Kutcher-Diaz believed that A.R.C. was currently experiencing severe physical, emotional, and psychological distress. As a result, he believed A.R.C. was not able to function independently. A.R.C.'s treatment records noted he had needed medication for agitation.

On cross-examination, Dr. Kutcher-Diaz confirmed that A.R.C. had initially sought medical care for an injury to his foot when he first arrived at the hospital. He further confirmed that, as far as he knew, A.R.C. had not been violent towards himself or to others. When asked to elaborate on what "overt action" had reflected that A.R.C. was a danger to himself, Dr. Kutcher-Diaz explained:

> It's the fact that he has poor insight into his mental illness and has poor insight into even the situations that occurred that brought him to the hospital. So[,] if he says that he's been walking for days and days and has no real explanation for it, then that tells me that if he were to get discharged, then more than likely he would deteriorate to the point that he would be at risk of harm to himself.

4

Dr. Kutcher-Diaz explained that overt acts could be shown through A.R.C.'s delusions and his expressed intent to act on them. Dr. Kutcher-Diaz repeated that A.R.C. had stated he had "an E-ray in his chest" and he asked staff whether they wanted "to open it to reorient it[.]" Dr. Kutcher-Diaz described that if A.R.C. were "to open himself up" he would bleed out if not in a medical setting. Finally, the trial court asked Dr. Kutcher-Diaz, in his medical opinion, if A.R.C. is released, could he "function and take care of himself outside in the real world?" Dr. Kutcher-Diaz responded "No."

In addition to the doctor's testimony, A.R.C. also testified at the hearing. During questioning, the following dialogue ensued:

THE STATE:  How are you feeling []?

A.R.C.:  Needing a shower and some change of clothes.

THE STATE:  Okay. And do you recall why you were brought into the hospital?

A.R.C.:  I do. Brought myself. I was brought in by myself. I walked in here by myself.

THE STATE:  And why is it that you were walking for a couple of days?

A.R.C.:  I don't have a car.

THE STATE:  And where were you walking to and from?

A.R.C.:  I was walking from detention -- a facility from a trespassing zone, and I went to the trespassing orient. And I went to go see if I can get a car, and I couldn't, so I had to stay walking from there.

THE STATE:  Okay. I'm sorry. So if I understand correctly, you were at the jail facility?

A.R.C.:  I was a trespasser at my own grandparents' house.

THE STATE:  Okay. So you were at your grandparents' house without their permission?

A.R.C.:  No. I went to go drop off food.

5

THE STATE:  Okay. And you were trying to get their car?

A.R.C.:  Did I say that?

.    .    .

THE STATE:  And so, [A.R.C.], maybe this is a point of confusion because I'm not understanding. So let's start. You were at your grandparents' house?

A.R.C.:  I wasn't at my grandparents' house. I didn't start with that.

THE STATE:  Okay. Where were you?

A.R.C.:  I was in my mother's womb.

THE STATE:  You were in your brother's room?

A.R.C.: No.  You can't hear me. Do you want me to step up?

THE STATE:  Oh, you were in your mother's womb?

A.R.C.:  I was in my mother's womb.

THE STATE:  Okay. And then what happened?

A.R.C.:  What do you mean? I came out in this beautiful hospital.

Following the hearing, the trial court entered an order finding A.R.C. was likely to cause serious harm to himself and to others; that he was suffering severe and abnormal mental, emotional, or physical distress; that he was experiencing substantial mental or physical deterioration of the ability to function independently; and that he was incapable of making a rational and informed decision as to whether or not to submit to treatment. Consequently, the trial court granted the application for temporary court-ordered mental health services for a period of 45 days.[3] This appeal followed.

---

[3] The trial court also entered an order to administer psychoactive medications, which we addressed in a separate appeal. *See State for A.R.C.*, 656 S.W.3d 396, 398 (Tex. App.—El Paso 2022, no pet.). There, we reversed the trial court's order, holding it was null and void because the contemporaneous order for temporary mental health services was invalid. *Id.* The State did not seek review of that decision by the Texas Supreme Court. Accordingly, we do not address here the trial court's order to administer psychoactive medications.

**DISCUSSION**

A.R.C. contends the evidence in the record is legally and factually insufficient to support by clear and convincing evidence the statutory grounds of danger to self, danger to others, or deterioration. *See* Tex. Health & Safety Code Ann. § 574.034(a)(1)–(2).

### A. Applicable law

Section 574.034 of the Texas Health and Safety Code is titled, "Order for Temporary Inpatient Mental Health Services." In relevant part, this provision states as follows:

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is a person with mental illness;
(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to the proposed patient;
(B) is likely to cause serious harm to others; or
(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
(iii) unable to make a rational and informed decision as to whether or not to submit to treatment;

Tex. Health & Safety Code Ann. § 574.034(a)(1)–(2). If the trial court finds that the proposed patient meets subsection (a)'s criteria, the court must specify which criterion forms the basis for the decision.

Additionally, § 574.034(d) provides:

(d) To be clear and convincing under Subsection (a), the evidence must include expert testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:
(1) the likelihood of serious harm to the proposed patient or others; or

> (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

*Id.* § 574.034(d).

## B. Standard of review

The State bears the burden of establishing by clear and convincing evidence the statutory requisites for a commitment order. *See* Tex. Code Crim. Proc. Ann. art. 46B.102(b); Tex. Health & Safety Code Ann. § 574.034; *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). Clear and convincing evidence is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam). Evidence that merely exceeds a scintilla is not legally sufficient when the burden of proof is clear and convincing. *See In re J.F.C.*, 96 S.W.3d 256, 264–65 (Tex. 2002); *see also Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004).

In evaluating evidence for legal sufficiency under a clear and convincing standard, we review all the evidence in the light most favorable to the finding to determine whether a reasonable fact-finder could have formed a firm belief or conviction that the finding was true. *See In re J.F.C.*, 96 S.W.3d at 266. We resolve disputed fact questions in favor of the finding if a reasonable fact-finder could have done so, and we disregard all contrary evidence unless a reasonable fact-finder could not have done so. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 266.

In determining whether the evidence is factually sufficient to establish the required elements by clear and convincing evidence, we must determine whether the evidence permits a fact-finder to reasonably form a firm belief or conviction about the truth of the State's allegations. *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In a factual sufficiency

review, a court of appeals must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. In contrast with legal sufficiency review, our focus is not simply upon the undisputed evidence that supports the verdict, but the disputed evidence as well. *Id.* at 266. We must consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

### C. Analysis

#### (1) The trial court's judgment

As a result of A.R.C.'s mental illness, the trial court's judgment concluded that: (1) he is likely to cause serious harm to self, (2) he is likely to cause serious harm to others, and (3) if not treated, he will continue to suffer severe and abnormal mental, emotional or physical distress and will continue to experience deterioration of the ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment. To this extent, the judgment determined that A.R.C.'s condition met all three of the criteria included in § 574.034(a)(1)–(2).

Proceeding in reverse order, we begin our review by focusing on the third criteria authorizing court-ordered inpatient mental health treatment, or § 574.034(a)(2)(C)(i)–(iii).

#### (2) Distress, deterioration, and medical decision–making

A proposed patient may be committed for treatment based on the "deterioration ground." *See State ex rel. D.L.S.*, 446 S.W.3d 506, 517 (Tex. App.—El Paso 2014, no pet.). To prevail on this ground, the State must show that the proposed patient is:

    (i)   suffering severe and abnormal mental, emotional, or physical distress;

9

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034(a)(2)(C). "[T]he State must prove all three subpart conditions are met before the trial court may order involuntary commitment on this ground." *State ex rel. D.L.S.*, 446 S.W.3d at 518. Here, A.R.C. does not contest his diagnosis of mental illness. As for the first of the three subparts, he neither contests that he suffered from severe and abnormal mental, emotional or physical distress. Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(i). To this extent, then, the center of this dispute centers on the second and third elements, or subparts (ii) and (iii) of § 574.034(a)(2)(C).

Record evidence established that A.R.C. went to the hospital, on his own, reporting he felt dehydrated, and he sustained a foot injury. Once there, he told his treating physician that he had been walking in the El Paso heat for several days. Dr. Kutcher-Diaz testified that, if A.R.C. continued walking for days at a time, he could be at risk of harm if left without food or water. Dr. Kutcher-Diaz also testified that A.R.C. expressed delusions that he had an "E-Ray" device in his chest and, he offered, they could open his chest if they desired. A.R.C. also reported other delusions, biblical in nature. If left untreated, Dr. Kutcher-Diaz noted the delusions could cause A.R.C. harm should he decide to act on them. Dr. Kutcher-Diaz also believed that A.R.C. could not care for himself if released from inpatient care at that point.

Relying on this Court's precedent, the State argues the evidence is sufficient to support temporary court-ordered inpatient mental health treatment. *See State ex rel. R.P.*, 511 S.W.3d 71, 77 (Tex. App.—El Paso 2014, no pet.). In *State ex rel. R.P.*, the expert psychiatrist testified that

10

the patient, R.P., was diagnosed with schizophrenic disorder and a possible cognitive disorder. *Id.* at 74. The doctor further described that R.P.'s mental illness caused him to have disorganized thinking. *Id.* at 77. As a result, R.P. was unable to make the decisions necessary to ensure his own safety. *Id.* In discussing the events leading up to the State's request, the doctor testified that the patient was wandering on foot at a park on the outskirts of El Paso. *Id.* He noted that R.P. reported he "wanted to see the desert and perhaps travel to Brownsville[,]" but he did not know where he was or which direction he traveled. *Id.* Additionally, R.P. did not have any food or water with him at the time. *Id.* When he began experiencing heart palpitations, he was transported by ambulance to the hospital. *Id.* Based on his examination and reported history, the doctor testified that he believed that R.P. remained "at risk of getting lost and dying of dehydration or starvation, and without treatment, he [would be] at high risk of his mental disorder getting worse." *Id.* at 74. The doctor believed R.P. "could not provide for his basic needs of food, water, and safety as a direct result of severely disorganized thinking." *Id.* at 79.

Based on the record evidence, this Court held that the evidence was sufficient for the probate court to conclude that the patient, as a result of his mental illness, was likely to cause serious harm to himself. *Id.* The decision further detailed that the patient was unable to support himself and remained homeless. *Id.* at 79. Evidence also showed the patient had voluntarily left a shelter before embarking on a journey without basic necessities such as food and water. Such conduct was attributed to his severe disorganized thinking. *Id.* Lastly, the record demonstrated the patient could not logically answer questions that were put to him. *Id.* For these reasons, the Court held there was sufficient evidence for the trial court to find, by clear and convincing evidence, that the patient was: (1) experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability to provide for his basic needs,

11

including food, clothing, health, or safety; and (2) he was not able to make a rational and informed decision on whether or not to submit for treatment. *Id.* at 79–80. Relying on that precedent, and because A.R.C. similarly showed signs of dehydration, disorganized thinking, and a lack of ability to care for himself, the State contends there was sufficient evidence here to support the trial court's commitment order based on deterioration.

Opposing, A.R.C. asserts the facts in *State ex. rel. R.P.* are distinguishable. Rather, A.R.C. contends: (1) there was evidence that A.R.C. was walking because he did not have a vehicle, not that he had planned to walk to another city; (2) there was no evidence that A.R.C. was in poor physical condition; (3) that A.R.C. mentioned he had grandparents, and (4) that A.R.C. went to the hospital on his own to seek medical treatment for his injured foot. Based on these distinctions, A.R.C. argues his case is more similar to another precedent of this Court. *See State ex rel. D.L.S.*, 446 S.W.3d at 518. In *State ex. rel. D.L.S.*, this Court concluded that, although the patient had bipolar disorder and exhibited severe mental, physical, or emotional distress, there was no evidence that his ability to care for himself had deteriorated from his diagnosis. *Id.* There, the record included evidence that the patient provided his own shelter by "car camping" in his vehicle, used his social security disability money to procure food and supplies, and showered at local gyms and campgrounds. *Id.* The Court thus determined that the only deterioration shown by the State was caused by appellants physical injury and not his mental illness. *Id.* In *State ex rel. D.L.S.*, the proposed patient also provided his consent to emergency surgery and explained his reasons for refusing certain medications. *Id.* Additionally, he had represented himself at trial, largely pro se, and asked mostly relevant questions, successfully bringing out information beneficial to his case. *Id.* at 519.

After reviewing both precedents, we disagree with A.R.C.'s contention that his case falls in line with *State ex rel. D.L.S.* Rather, in this instance the trial court heard Dr. Kutcher-Diaz's testimony describing A.R.C.'s expressed delusions and disorganized thinking. For example, A.R.C. mentioned he had "an E-ray" in his chest that could be opened and reoriented; he believed he could hydrate from his "feet and wings;" and he brought up certain biblical delusions. From these conditions, and because A.R.C. could not clearly explain why he had been walking for days or weeks in excessive heat, Dr. Kutcher-Diaz opined that A.R.C. lacked insight into his mental illness to such a degree that he could not properly care for his basic needs. Having viewed the record as a whole, we conclude the evidence is both legally and factually sufficient to support the trial court's findings that the criteria of § 574.034(a)(2)(C) was met. Because § 574.034(a)(2) lists the statutory grounds of (A), (B), and (C) in the disjunctive, we need not address grounds (A) and (B). Tex. R. App. P. 47.1.

We overrule A.R.C.'s sole remaining issue on appeal.

## CONCLUSION

We affirm the trial court's order temporarily committing A.R.C. for temporary inpatient mental health treatment.

GINA M. PALAFOX, Justice

July 18, 2024

Before Alley, C.J., Palafox and Soto, JJ.

13