

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-18-00197-CV**
**NO. 02-18-00198-CV**

IN THE MATTER OF A.T.

----------

FROM THE PROBATE COURT OF DENTON COUNTY
TRIAL COURT NOS. MH-2018-242, MH-2018-242-01

----------

## MEMORANDUM OPINION[1]

----------

In these two consolidated and accelerated appeals, appellant A.T. appeals the trial court's judgment temporarily committing her to a state hospital for the receipt of inpatient mental health services along with the trial court's judgment authorizing the administration of psychoactive medication. She argues that the evidence is legally and factually insufficient to support the requirements for

---

[1]*See* Tex. R. App. P. 47.4.

inpatient commitment under chapter 574 of the Texas Health and Safety Code and that because we must reverse the commitment judgment, we must also reverse the medication judgment that depends upon the commitment. We hold that the evidence is legally and factually sufficient to support the commitment judgment, so we affirm both judgments.

## Background

In May 2018, a mental health professional filed an application for the trial court to order inpatient mental health services for A.T.[2] Dr. Asad Islam filed a certificate of medical examination to support the application. In his certificate, Dr. Islam diagnosed A.T. with schizophrenia and explained that she had disorganized thoughts, rapid speech, paranoid thinking, and aggression. Dr. Islam also stated that A.T. was "unaware of her deteriorating mental and physical health." Based in part on Dr. Islam's certificate, the trial court ordered A.T.'s temporary commitment to a state hospital pending a trial on the application.

Before trial, a second doctor—Peter Fadow—likewise filed a certificate of medical examination.[3] Dr. Fadow diagnosed A.T. with schizoaffective disorder. His certificate stated,

---

[2]See Tex. Health & Safety Code Ann. § 574.001(a) (West 2017) (stating that any adult may file an application for court-ordered mental health services).

[3]A hearing on an application for court-ordered mental health services may "not be held unless there are on file with the court at least two certificates of medical examination for mental illness completed by different physicians . . . ." Tex. Health & Safety Code Ann. § 574.009(a) (West 2017).

2

[A.T.] has been non-compliant with outpatient treatment and medication for her schizoaffective disorder[,] and [she] decompensated. She is severely depressed[,] isolating at her home[,] and not taking care of her basic needs[,] endangering herself. . . . [A.T. has] paranoid delusional thought[s] that her family is out to harm her and steal money from her disability checks. According to family [A.T.] has broken furniture in her apartment and [has] been making complaints that men are coming through and stealing things. Police were contacted and could not find any evidence of a break in or theft. . . . Police report[ed] rotting food found in the sink and no edible food in [the] residence. [A.T. is] not bathing [and] she is not able to take care of basic needs despite numerous police and family interventions . . . .

Dr. Fadow also filed an application for the trial court to order the administration of psychoactive medication to A.T. He alleged that she was refusing to take medication voluntarily; that treatment with medication was in her best interest; and that if she did not take the medication, she would continue to have symptoms of psychosis. The trial court authorized the administration of medication pending a trial on that application.

The trial court conducted one bench trial on both applications. At the end of the trial, the court signed a judgment committing A.T. to a state hospital for a period not to exceed ninety days and a judgment authorizing the administration of psychoactive medication.

In its commitment judgment, the court found that (1) A.T. is suffering severe and abnormal mental, emotional, or physical distress; (2) she is experiencing substantial mental or physical deterioration of her ability to function independently as exhibited by her inability to provide for her basic needs such as food, clothing, health, and safety; (3) she is unable to make a rational and

3

informed decision on whether to submit to treatment; and (4) she is unable to participate in outpatient treatment effectively and voluntarily. The court did not find that A.T. was likely to harm herself or others.

In the medication judgment, the court found that the administration of medication is in A.T.'s best interest and that she lacks the capacity to make a decision concerning the administration of the medication. The court also found that A.T. would suffer severe consequences if she did not take the medication. The court authorized the state hospital to administer antidepressants, antipsychotics, anxiolytics, and mood stabilizers.

From the two judgments, A.T. brought these appeals.

## Evidentiary Sufficiency

In this court, A.T. raises one issue that we construe as a challenge to the legal and factual sufficiency of the evidence to support the trial court's judgment ordering her inpatient commitment to a state hospital.[4]

A trial court may order a person to receive temporary inpatient mental health services when it finds that there is clear and convincing evidence of the circumstances described in section 574.034(a) of the Texas Health and Safety Code. *See* Tex. Health & Safety Code Ann. § 574.034(a) (West Supp. 2017).

---

[4]In the appeal related to the medication judgment, A.T. has filed a document showing that her challenge to that judgment depends upon a successful challenge to the commitment judgment. *See* Tex. Health & Safety Code Ann. § 574.106(a)(1) (West 2017) (stating that a court may issue an order authorizing the administration of psychoactive medication to a patient who is "under a court order to receive inpatient mental health services").

Due process requires the clear and convincing standard of proof. *In re C.H.*, 89 S.W.3d 17, 22 (Tex. 2002); *see also In re A.J.W.*, Nos. 02-15-00028-CV, 02-15-00029-CV, 2015 WL 1407890, at *2 (Tex. App.—Fort Worth Mar. 26, 2015, pet. denied) (mem. op.) ("Because an involuntary commitment is a drastic measure, the . . . evidentiary standards . . . are high."). As we have explained in a case applying section 574.034(a), clear and convincing evidence is a quantum of evidence that will produce a "firm belief or conviction as to the truth of the allegations sought to be established. . . . While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed." *In re S.S.*, No. 02-15-00163-CV, 2015 WL 4561884, at *2 (Tex. App.—Fort Worth July 28, 2015, no pet.) (mem. op.).

To review the legal sufficiency of evidence when the burden of proof is clear and convincing evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *A.J.W.*, 2015 WL 1407890, at *3. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we must disregard all evidence that a reasonable factfinder could have disbelieved. *J.F.C.*, 96 S.W.3d at 266.

The clear-and-convincing-evidence standard also affects our standard of review for factual sufficiency. *In re M.T.*, Nos. 02-17-00011-CV, 02-17-00012-

5

CV, 2017 WL 1018596, at *5 (Tex. App.—Fort Worth Mar. 16, 2017, no pet.) (mem. op.). In reviewing the evidence for factual sufficiency, we inquire whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations supporting the commitment. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.*

Under section 574.034(a), a trial court may order an involuntary commitment for temporary inpatient mental health services if the court finds that clear and convincing evidence shows that a patient is mentally ill[5] and is

> (i) suffering severe and abnormal mental, emotional, or physical distress;

> (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

> (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034(a)(1), (2)(C)(i)–(iii); *see also State ex rel. D.L.S.*, 446 S.W.3d 506, 518 (Tex. App.—El Paso 2014, no pet.) ("The three subparts of this statutory ground are read conjunctively, not disjunctively.").

To clearly and convincingly meet these requirements, the evidence must "include expert testimony and, unless waived, evidence of a recent overt act or a

---

[5]On appeal, A.T. does not dispute the trial court's finding that she has a mental illness.

continuing pattern of behavior that tends to confirm" the "proposed patient's distress and the deterioration of the proposed patient's ability to function." Tex. Health & Safety Code Ann. § 574.034(d)(2); *see S.S.*, 2015 WL 4561884, at *2 ("Proof of mental illness, such as evidence of psychosis, hallucinations, or delusions, without more, does not fulfill the statutory requirement for ordering involuntary inpatient mental health services. There must also be an overt act or continuing pattern of behavior that tends to confirm the likelihood of . . . deterioration." (citations omitted)); *A.J.W.*, 2015 WL 1407890, at *2 (explaining that "[e]xpert testimony is essential" but that an expert's diagnosis of a mental illness alone "is not sufficient to confine a patient for compulsory treatment"). A proposed patient's words are relevant in predicting what actions the patient might take in the future as a result of mental illness. *M.T.*, 2017 WL 1018596, at *6.

Facts that appear in the clerk's record—such as facts that we recited above that appear in certificates of medical examination—but that are not also admitted as evidence at trial cannot support the trial court's judgment of commitment. *A.J.W.*, 2015 WL 1407890, at *4. Thus, we will confine our review to the evidence presented at trial.

The trial court received testimony from three witnesses: Dr. James Shupe, A.T.'s mother J.T., and A.T. The court also admitted medical records from A.T.'s treatment at the state hospital.

7

**Dr. Shupe's testimony**

Dr. Shupe, a medical doctor specializing in psychiatry, supported A.T.'s inpatient commitment. He explained that her eviction from a duplex precipitated her confinement in the state hospital. Her family notified the police of concerns that she was not functioning well at the duplex. When the police arrived there, she became agitated and "was not thinking logically." She asked the police to look at her cell phone "because she felt it was being bugged." She also claimed that someone was getting into the duplex through a window and admitted to the police that she had not eaten that day.

The police concluded that she was unable to care for herself because she did not have any edible food and because her duplex was dirty and unsafe, as indicated in part by the presence of rotting food in a sink.[6] She had not been caring for her physical needs; for example, she had bilateral edema swelling of her legs caused by poor nutrition.

Upon her arrival at the state hospital, A.T. had disagreements with peers because she became intrusive and provocative with them. When she saw a patient who had pants hanging below her waistline, she told the patient to "pull up her pants since nobody want[ed] to see her butt," and the other patient pushed her to the ground. A.T. invaded other patients' space and "was asking [patients] and staff questions that she should [have known] the answers to." At

_____

[6]A medical record shows that the duplex was also "infested with house flies."

8

times, she became tearful and irritable. However, at other times, she was compliant with treatment, alert, calm, cooperative, quiet, oriented, polite, patient, friendly, and pleasant.

Dr. Shupe testified that A.T. disagrees with her diagnosis of schizophrenia. He also stated, "I don't believe she understands her illness, and when you try and talk with her about conditions including her medical situation, she isn't able to rationally discuss that." Dr. Shupe testified that A.T. has cognitive limitations "that will continue." He testified that although she told him that she would continue to take medications upon release from the state hospital, he was doubtful that she would do so because she was "evasive about whether she thought [the medications] were actually helping her" and because she had a years-long history of failing to take appropriate medications.[7] According to Dr. Shupe, A.T. has a history of receiving mental health treatment that has not benefited her to the extent of allowing her to remain unconfined in a state hospital. Although A.T. told Dr. Shupe that she would seek outpatient treatment if released, she "didn't give a specific place she would go," and he doubted whether she would seek such treatment.

Dr. Shupe testified that A.T. wanted to be released and that upon release, she planned on living at the Salvation Army. Dr. Shupe also testified that A.T.

---

[7]J.T. described A.T. as "incapable of taking medicines as directed." One of A.T.'s medical records shows that during her stay at the state hospital, when asked how taking medication had helped her in the past, she said, "[I]t hasn't[;] it's made everything worse."

9

expressed a plan to "get a triple major" at a university, but he characterized that plan as unrealistic because A.T. "has been challenged intellectually throughout her schooling" and because "she hasn't even dealt with the basic needs she would have on a daily basis." Although he stated that she has a fair prognosis, he expressed doubts that she will "ever get to the point where she functions independently. She'll always need someone to supervise and watch over her." He explained that she has "always required someone to take care of her in the past" and that her husband did so before their divorce.

From all of these facts, Dr. Shupe opined that unless the trial court committed A.T. so that she could receive mental health services, she would deteriorate in her ability to function independently and to provide for her basic needs. He testified that he was asking the court to continue A.T.'s inpatient treatment because of her

> inability to care for herself and function without other people [as] demonstrated by how she did prior to going into the hospital. [Inpatient treatment is also necessitated because of her] refusal to work with her parents, her support system, in trying to care for her and provide for herself once she gets out of the hospital and her continued statements about her treatment and her illness, [along with] the fact that she doesn't still really believe she has an illness and doesn't think she needs medication.

**J.T.'s testimony**

J.T. testified that A.T. has had a lenthy struggle with her mental health, that she has had prior inpatient hospitalizations, that she has been diagnosed as bipolar, and that she has a history of "go[ing] into manic modes where she has

10

grandiose ideas of her abilities." J.T. explained that at one point, when she became concerned about A.T. and urged her to go to a behavioral hospital, A.T. agreed to do so but stayed only one day before she signed herself out.

J.T. testified that after one of A.T.'s releases from a psychiatric hospital, she lived with J.T. for over a year. During that time, A.T. became more stable and obtained employment. But beginning in December 2017, her mental condition worsened. She began having uncontrollable emotional outbursts, lost her job, and moved out of J.T.'s house. J.T. cosigned a lease on A.T.'s duplex, but within a week of A.T. moving there, her landlord evicted her because she did not follow rules of the lease. When J.T. saw the condition of the duplex upon A.T.'s eviction, she noticed that there was broken furniture, that A.T. had not put her bed together, that a sink was full of dishes, that there were cigarette butts "strung all over the property," and that walking through the duplex was difficult because she had to "step over things to get from one place to another."

J.T. opined that if the court released A.T. from the state hospital, A.T. would not be able to care for herself and would die. She explained,

> [A.T.] can't live on her own. She can't take care of herself. She is not aware of dangers that she walks into and lives through. She acquaints [with] people who are very scary. . . . It is terrifying to me on two levels. One, she's a walking victim. She's been exploited her entire life physically, financially. Any way you can imagine, people exploit [A.T.]. She has an unfounded hatred for her father, and she is delusional and paranoid about those things to the extent that I don't know what she's capable of. . . . And I pray to God that she can be in a safe place and can be treated to the extent that at some point in the future she will live in the real world where she'll be safe.

11

**A.T.'s testimony**

A.T. testified that by the time of the trial, she had been confined in the state hospital for almost a month. She asserted that at the state hospital, she was maintaining good hygiene, receiving nutrition, taking her medications, and learning coping skills such as taking deep breaths to relieve frustration. A.T. testified that the medications she had taken at the state hospital had helped her "think clearly." She said that she was "more organized" and that she did not "ask a billion questions all the time."

A.T. testified that if the trial court ordered her release from the state hospital, she would seek outpatient treatment and would continue to take her medications. She stated that she could live with friends or stay at the Salvation Army, which has "several programs for people with disabilities." While A.T. acknowledged that she would be able to sleep at the Salvation Army only five nights every fourteen days, she testified that she could stay with friends or at shelters on other days. A.T. testified that she had "$80 to [her] name," and she acknowledged that she would need to use community resources if the trial court ordered her release.

When A.T.'s counsel asked her why she did not have food in her duplex upon the police's arrival there, she testified,

> Well, I'm a single female. I'm not about to go shopping for two weeks straight, especially when I don't have a car. I have never actually ridden a bus so I need to learn how to do that. I would go to the gas station or whatever was closest within walking distance during the day so it was safer and get what I needed for a couple of

days and then go back whenever . . . I ran out of cigarettes or if I ran out of food, whichever came first. My dumpsters were actually a few feet away from my porch, so I never had a need for a trash can in the duplex . . . . I kept the place clean. The food I would take out daily and weekly. I never had a disposal in my sink either so I had to constantly clean that out.

A.T. acknowledged that the duplex was messy with dishes and food but denied that she was malnourished or that she had bad hygiene while she lived there.

**The medical records**

A.T.'s medical records reveal facts related to her conditions upon arriving at the state hospital and during her stay. A.T.'s psychiatric evaluation upon arrival stated in part,

[A.T.] is a 40-year-old Caucasian female with a history of Schizophrenia . . . .

When seen today the patient [was] agitated and aggressive. . . . She started talking about her family being crazy [for] putting her here. She did not think she had any kind of mental illness and said that she does not need any medications and needs to be discharged right away. . . .

. . . It was very difficult to interview the patient. I did not get much relevant information due to her irritability but she refused all medications.

A physician's progress note written near the beginning of A.T.'s stay states, among other facts, that she had "clearly lost considerable weight" and that she was tearful and frustrated. A similar note written after the first note states that A.T. had delusional themes in her speech, that she was "very paranoid," and that she admitted to having learning disabilities during her childhood. A third note, written days after the second note, states that A.T. had an irritable and

13

depressed mood, that she was "very paranoid and psychotic," and that she was "unable to form a realistic plan for managing her basic needs in the community." A fourth note, written about one week before the trial, states that A.T. continued to be upset, that she denied her mental illness, that she claimed that her family was plotting against her, and that she became agitated and threatened to report her doctor to a medical board.

Nurses' notes from the days leading up to the trial reflect that A.T. was taking her medication and that "things [were] finally getting evened out" for her. The nurses' notes, along with other documents generated during A.T.'s state-hospital stay, also reflect that A.T.'s hygiene and nourishment had improved, that she was neat and alert, that she had stable moods, and that she was generally polite and friendly. Some of the nurses' notes from the earlier parts of A.T.'s commitment state that she had those same qualities at times but that at other times, she was tearful, argumentative, and resistant to taking medications.

**The trial court's ruling**

After hearing the parties' evidence and arguments, the trial court ordered A.T.'s temporary inpatient commitment. The court stated,

> After considering the evidence and testimony and the certificate filed, the Court finds that the facts alleged in the above-mentioned application are true and correct. I appreciate the evidence that you have offered as to her present condition, and, yes, I would agree that . . . perhaps the future prognosis is positive but it's going to take a while to get there. The evidence that I've heard as to her conduct outside of the hospital leads to the conclusion that she is unable to make rational and informed decisions as to how to take care of herself and her treatment and has the inability to participate in

14

outpatient treatment services effectively and voluntarily at this time. Hopefully, with continued hospitalization and the appropriate medication, she will learn the patterns and be able to take care of herself. . . . In hopes that the prognosis for the future for her will be appropriate and positive, I'm going to continue her hospitalization.

**Analysis**

We hold that the evidence detailed above, although conflicting in some respects, was sufficient to support the trial court's clear-and-convincing findings of the grounds for commitment. *See* Tex. Health & Safety Code Ann. § 574.034(a)(1), (a)(2)(C), (d)(2).

The trial court could have reasonably determined that A.T. was suffering from severe mental or emotional distress based on events occurring before and after her commitment to the state hospital, including her paranoid and illogical thinking that she expressed to police officers upon her eviction from the duplex; her agitation with the state hospital's personnel (including her doctors) and her intrusion into other patients' affairs; her statement that she planned to obtain three degrees from a university when the evidence shows that she has a history of learning disabilities; and J.T.'s testimony that before A.T. moved into the duplex, she lost a job because of uncontrollable emotional outbursts. *See id.* § 574.034(a)(2)(C)(i); *see also State for Best Interest & Prot. of H.S.*, 484 S.W.3d 546, 551 (Tex. App.—Texarkana 2016, no pet.) (holding that evidence was sufficient to support a finding under subsection (a)(2)(C)(i) when the patient exhibited delusional thinking).

15

Next, the trial court could have reasonably found that A.T. was experiencing substantial mental or physical deterioration of her ability to function independently as exhibited by a failure to provide for her basic needs. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(ii). The evidence shows that upon A.T.'s eviction, her duplex was dirty, cluttered, and unsafe; that she did not have any food there; that her poor nutrition had caused swelling of her legs; that she had poor hygiene upon her commitment; that she has a history of associating with people who are "very scary" and who exploit her; that she has a history of needing others to take care of her and to ensure that she takes appropriate medications; and that she did not have a permanent, stable plan for where to reside or for how to meet her needs upon her release. *Cf. State for Best Interest & Prot. of S.R.*, Nos. 13-17-00061-CV, 13-17-000129-CV, 2017 WL 1455083, at *4–5 (Tex. App.—Corpus Christi Apr. 20, 2017, no pet.) (mem. op.) (holding that the evidence was sufficient to support a finding under subsection (a)(2)(C)(ii) when a doctor testified that the patient did not eat properly and that she was not able to secure a safe environment in the community); *In re T.J.H.*, No. 02-10-00149-CV, 2010 WL 3433049, at *8 (Tex. App.—Fort Worth Aug. 31, 2010, no pet.) (mem. op.) (holding that the evidence was sufficient to prove a patient's inability to provide for her basic needs when the patient had poor judgment and poor self-care and when her noncompliance with treatment had resulted in prior hospitalizations).

16

The trial court could have also reasonably found that A.T. was unable to make a rational and informed decision as to whether to submit to treatment. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(iii). Although A.T. expressed her desire to be released and represented that she would seek outpatient treatment and would continue to take her medications upon her release, the trial court could have reasonably disbelieved her because the evidence shows that she has a history of denying her mental illness, of failing to take appropriate medications, and of failing to recognize the need for treatment or seek such treatment; that she was not able to rationally discuss her commitment with Dr. Shupe; and that she has ongoing cognitive limitations. *Cf. H.S.*, 484 S.W.3d at 552 (holding that the evidence was sufficient under subsection (a)(2)(C)(iii) when the patient had a severe mental illness but denied that she needed treatment).

Finally, the trial court could have reasonably found evidence of a continuing pattern of behavior confirming A.T.'s distress and the deterioration of her ability to function. *See* Tex. Health & Safety Code Ann. § 574.034(d)(2). The evidence showed that A.T. has a history of receiving mental health treatment, including prior inpatient hospitalizations, and of decompensating because she fails to maintain the treatment and fails to take appropriate medications. Dr. Shupe explained that A.T. has always required someone to take care of her in the past, and he opined that she will always need someone to supervise her. He further explained that A.T. does not have a support system and that she has refused to allow her parents to assist her in maintaining consistent treatment for

17

her mental illness. J.T. explained that after A.T. had been living on her own in the duplex for only a week, the duplex became dirty and unsafe. Like Dr. Shupe, J.T. testified that A.T. cannot take care of herself; she explained that A.T. is delusional and paranoid and that she enters into dangerous relationships. We conclude that these facts are sufficient to satisfy the requirement of section 574.034(d)(2). *See id.*; *In re M.R.*, No. 02-15-00221-CV, 2015 WL 6759249, at *9 (Tex. App.—Fort Worth Nov. 3, 2015, no pet.) (mem. op.) (holding that a patient had a continuing pattern of behavior indicating his inability to function independently when his history included a relapse after a failure to take medication, he continued to exhibit symptoms of his mental illness during his commitment, and he rejected his parents' offer to provide food, clothing, shelter, and safety); *In re P.O.C.*, No. 02-13-00263-CV, 2013 WL 5517889, at *2–5 (Tex. App.—Fort Worth Oct. 3, 2013, no pet.) (mem. op.) (holding that the evidence was sufficient to meet the "continuing pattern of behavior" requirement when the patient had a long-term mental illness, had a prior inpatient commitment, and had a history of decompensating when he did not take medications).

On appeal, A.T. relies on evidence showing that during her commitment, she stabilized and exhibited an improved ability to meet her needs. But a patient's improved condition during a commitment does not negate a trial court's authority to continue the commitment when the patient has poor insight into a mental illness and when there is a likelihood that improvements attributed to a patient's medications will reverse when the patient stops taking the medications

18

upon release. *See M.R.*, 2015 WL 6759249, at *9. Under the evidence in this case, the trial court could have reasonably attributed A.T.'s improvements to supervision and care that she would be unlikely to receive upon her release.

For all of these reasons, although we acknowledge that the record contains evidence weighing against the trial court's findings supporting A.T.'s commitment, we conclude that the trial court could have reasonably given more weight to evidence that enabled the court to form a firm belief or conviction of the requirements for a temporary inpatient commitment under section 574.034. *See* Tex. Health & Safety Code Ann. § 574.034(a)(1), (2)(C)(i)–(iii), (d)(2). We therefore hold that the evidence is legally and factually sufficient to support the trial court's commitment judgment and the court's medication judgment that depends upon the commitment judgment. *See J.F.C.*, 96 S.W.3d at 266; *M.T.*, 2017 WL 1018596, at *5. We overrule A.T.'s sole issue.

### Conclusion

Having overruled A.T.'s only issue, we affirm the trial court's judgments.

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL: KERR, PITTMAN, and BIRDWELL, JJ.

DELIVERED: July 12, 2018

19